No. 43,328

PHILLIPS PIPE LINE COMPANY, a Corporation, *Appellee,* v. KANSAS COLD STORAGE, INC., a Corporation, *Appellant;* James K. Steele Excavation Company, a Corporation, and James K. Steele, an Individual, *Defendants.*

(389 P. 2d 766)

Opinion filed March 7, 1964.

*F. C. McMaster,* of Wichita, argued the cause, and *P. K. Smith* and *Standord J. Smith,* of Wichita, were with him on the briefs for the appellant.

*Robert M. Siefkin,* of Wichita, argued the cause, and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Richard C. Harris, Gerald Sawatsky, Donald L. Cordes, Robert L. Howard, Charles J. Woodin* and *Mikel L. Stout,* all of Wichita, and *Gary W. Davis,* of Bartlesville, Oklahoma, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: This was a damage action for breaking a pipe line owned and operated by the plaintiff, Phillips Pipe Line Company, which crossed real estate belonging to the defendant landowner, Kansas Cold Storage, Inc. The action was commenced by Phillips against the appellant and James K. Steele Excavation Company, a corporation. The petition was later amended to add James K. Steele, an individual, d/b/a James K. Steele Excavation Company.

On April 23, 1962, over the objection of the defendant landowner, a default judgment was entered in favor of Phillips against James K. Steele d/b/a James K. Steele Excavation Company for the sum of $13,489.16.

Thereafter, a jury trial was had which resulted in a judgment in favor of Phillips against the defendant landowner in the sum of $12,076.16. Following the overruling of its post trial motions the defendant landowner appealed.

Phillips' petition, omitting all formal allegations, alleged that the appellant was the owner of an 80-acre farm; that Phillips owned two pipe-line easements across the farm which were duly recorded in Sedgwick County; that the appellant, acting through its duly authorized agents, contracted with James K. Steele Excavation Company to grade and excavate the land lying adjacent to, over and upon the pipe line of Phillips; that for the proper performance of the contract, the appellant allowed Steele and his employees, to go upon the land with earth moving equipment; that in carrying out the contract, an employee of Steele struck and broke the pipe line; that the appellant, knowing or having reason to know of such pipe line and its location, was negligent in the following respects: allowing Steele to grade and excavate in the area where the pipe line was broken; failing to give warning or notice to Steele of the pipe line or its location, or secure a contractor who was possessed of the proper equipment, skill and knowledge to protect the pipe line; failing to properly supervise the conduct of Steele in the grading and excavating, and authorizing and permitting him to grade and excavate to depths below plow depth.

The petition then alleged specific acts of negligence of Steele and alleged that the proximate cause of the loss sustained by Phillips was due to the negligence of the defendants.

The petition contained a second count based upon *res ipsa loquitur* and incorporated therein all of the pertinent allegations of the first count of the petition. (The cause of action based upon *res ipsa loquitur* was dismissed at the conclusion of plaintiff's evidence.)

The appellant demurred to Phillips' petition, which demurrer was overruled, and in view of conclusions hereafter announced it is unnecessary that we consider the correctness of the district court's ruling thereon. However, in passing we note that the petition disclosed there was a contract between the appellant and Steele for grading and excavating, but no other particulars, if any, of the contract were alleged, specifically with respect to who had control and direction of the work involved, nor were there any allegations that the contract for grading and excavating was inherently and intrinsically dangerous.

Phillips' evidence is summarized: John L. Bear was president of Kansas Cold Storage, Inc., at all times here pertinent, and it owned

an 80-acre farm which was used for commercial hog raising. The farm extended one-half mile east and west and a quarter mile north and south. It is described as the North one-half of the Northeast quarter of Section 2. 29th Street runs east and west along the north side and West Street runs north and south along the east side.

Phillips owned two easements across the farm for the construction, operation, repair and maintenance of pipe lines. One easement agreement was executed by appellant's predecessor in title in 1941, and the second was executed by appellant in 1951. Both were blanket easements covering the entire 80-acres without any designation as to where a pipe line should be laid or extended across the property. The first agreement provided that Phillips should bury its pipe line below plow depth, but the second agreement contained no clause relative to the depth the pipe line was to be buried; both provided that the grantor landowner could fully use and enjoy the premises except for the purposes provided in the easement agreements. Both agreements were recorded.

Pursuant to the 1941 easement, Phillips laid an 8-inch line, known as the Cheney "A" line, which ran in a northeasterly-southwesterly direction across the farm. Later, under the 1951 easement, a 12-inch line, called the Cheney "B" line was laid parallel to and eight feet to the left of the Cheney "A" line.

In 1950, before the Cheney "B" line was constructed, Bear contracted with the Steele Excavation Company to excavate and grade two drainage ditches running east and west across the farm. The purpose of the drainage ditches was to drain off excess water. One ditch was constructed near the south side of the property and the other was constructed near the north side. The ditches were 10 feet wide at the bottom with sloping sides and approximately two feet below ground level at the east end and a little higher or about one and a half feet deep at the upper or west end so that sewage, water and refuse would drain from west to east.

Before Steele commenced the initial excavating and grading, Phillips was contacted to locate the Cheney "A" line. In constructing the ditches, Steele exposed the Cheney "A" line in the south ditch and it has remained exposed. However, the pipe line was buried deeper where Steele constructed the north ditch and is was not contacted or exposed.

In 1951 Phillips requested permission to take up the Cheney "A" line crossing the farm and the drainage ditches to rewrap it. The

line was rewrapped, placed back in the ground and reburied, however, the line still remained exposed in the south ditch.

Prior to March, 1959, Raymond Wirth and the appellant entered into an oral contract for the purpose of raising hogs on the 80-acre farm for their mutual profit. Wirth was a building contractor and part-time hog raiser. He was not an employee of the appellant. Under their contract, the appellant was to put up the money and Wirth was to run the hog farm as he saw fit; he was to manage the farm, feed and take care of the hogs and make a profit, and after all expenses were deducted he was to divide the profits with the appellant fifty-fifty. Wirth spent afternoons and evenings out at the hog farm. Neither Bear nor anyone at Kansas Cold Storage directed his work. He was his own boss and his duties consisted generally in overseeing the operation.

Early in March, 1959, Wirth contacted Bear and suggested that the north drainage ditch be cleaned out in order to get better drainage of the farm. Bear gave him approval to go ahead, and suggested Steele for the job since he had originally dug both ditches. Wirth contacted the Steele Excavation Company and Steele met him at the farm. Wirth entered into an oral contract with Steele to clean out the north ditch at a stated rate per hour. The only direction Wirth gave Steele regarding the ditch was to "just clean it out." The manner in which the work was to be done was left entirely up to Steele. Wirth knew there was a pipe line across the tract somewhere but did not know exactly where it crossed the field underneath the ground. He had seen the marker on the north side of the land (south side of 29th Street), but it did not enter his mind to tell Steele about it, if it had, he would have mentioned it. He did not see Steele again at the farm.

Steele started the job on the 20th or 21st of March, 1959, using his own equipment. With respect to the contract, he testified:

"I do not recall any specifications being given. They just wanted it cleaned out. I can remember how wide the drainage ditch was because I dug it originally. . . .

"A man by the name of Southworth was operating the equipment when the accident occurred. I was the one that directed him as to the work. He was using a crawler tractor with a carryall behind it. . . ."

Southworth testified:

"I was to clean out the silt and dirt that had worked into the drainage ditch. The ditch was approximately ten feet wide at the bottom and had slopes on either side. The ditch was approximately two feet deep at one end and a foot and a half to two feet at the other end. I was told to clean it out

by Mr. Steele. I did not know of the existence of any pipe lines. I was working on a slope pulling a scoop with a tractor when I hit the pipe line. . . . Mr. Steele told me to do the job, to clean out the ditch."

In the late afternoon of March 22, 1959, Wirth went out to the hog farm and saw the operator cleaning the drainage ditch. At that time Southworth had completed cleaning the ditch east of the Cheney "A" line and some work had been done on the west side, but most of the ditch west of the pipe line remained to be cleaned. Wirth went over to where Southworth was working and had a brief conversation with him. When Southworth came to work the next morning, March 23, 1959, he parked his car on the south side of 29th Street in front of the painted posts and marker placed there to indicate Phillips' Pipe line. He walked about 600 feet across the field to his equipment and commenced reworking the ditch immediately east of where the Cheney "A" line crossed under it, where he had worked the night before. While reworking the ditch at that point, his equipment struck the line, ruptured it and caused gasoline to flow into the ditch. Measurements taken outside of the drainage ditch after the break occurred indicated the Cheney "A" line was 30 inches below ground level on one side of the ditch and approximately 28 inches below ground level on the other side.

Bear was not a witness for either party but his written statement to Phillips' witness Coyle is summarized and quoted as follows: Bear knew of the existence of the pipe line crossing the farm, but he did not know whether Wirth knew about it or not. When Wirth talked with Bear about cleaning out the ditch, Bear stated:

"I did not say anything to Mr. Wirths about the existence of the pipeline. It didn't occur to me. The fact that the drainage ditch had been dug 8 or 9 years ago suggested to me that there was no danger of the pipeline being ruptured. . . . I did not have any contact with Mr. Steele of the Excavation Company."

Shortly after the pipe line was ruptured Phillips was notified and temporary repairs were made. A few days later, the temporary repairs were made permanent and the line was reburied. Steele finished cleaning the ditch west of the pipe line, and he was later paid by the appellant for his work.

The appellant first argues that the district court erred in overruling its demurrer to Phillips' evidence. Stripped of all frills, under its petition Phillips had two alternatives to sustain the burden of proof for a prima facie case to impute the negligence of Steele to the appellant; first, to prove an agency or employee relationship between the appellant and Wirth and then an agency or

employee relationship between Wirth and Steele; or second, an agency or employee relationship between the appellant and Steele directly. The record is bare of any direct agency or employee relationship under the second alternative.

Without belaboring the case, we are of the opinion Phillips' evidence established that the appellant and Wirth were at least engaged in a joint adventure to commercially raise hogs. In the recent case of *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P. 2d 824, it was said that a joint adventure was an association by two or more persons to carry out a single business enterprise for profit. That case discussed fully the relationship of joint adventure and it is unnecessary to repeat what was said and held on that subject, and the reader is referred to that opinion. There it was held that parties to a joint adventure may be deemed participants in a joint enterprise for the purpose of the application of the tort rule of imputing negligence, and it was said:

". . . Under the doctrine of joint enterprise or joint adventure the negligence of one participant in such enterprise or adventure may be imputed to another participant so as to render the latter liable for an injury sustained by a third person as the result of the negligence. The law considers that each is the agent of the other, and the acts of one within the scope of the enterprise or adventure may be charged against the other. . . ." (l. c. 363.)

The appellant contends that Steele, who was employed by Wirth, was an independent contractor and that the relationship between them was that of contractor and contractee and not that of master and servant and that the appellant through Wirth, as contractee, was not liable for the negligent manner in which Steele, the contractor, executed the contract to clean the ditch. Various definitions have been given to the term "independent contractor." In *Pottorff v. Mining Co.*, 86 Kan. 774, 122 Pac. 120, an independent contractor was defined as ". . . one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to the result of his work." (Syl. ¶ 2.)

This definition has been consistently followed in many cases, a few of which are: *Warren v. City of Topeka*, 125 Kan. 524, 528, 265 Pac. 78; *Bittle v. Shell Petroleum Corp.*, 147 Kan. 227, 231, 75 P. 2d 829; *Lehman v. Grace Oil Co.*, 151 Kan. 145, 148, 98 P. 2d 430, and *Evans v. Board of Education of Hays*, 178 Kan. 275, 278, 284 P. 2d 1068. See, also, Restatement of the Law, Agencies, § 2 (3) and Restatement of the Law, Torts, § 403a.

At most, Phillips' evidence disclosed that Wirth entered into a

contract with Steele whereby Steele was to clean the silt out of the north drainage ditch at a predetermined rate per hour. Nothing else was said; no specifications were given, and the manner in which the work was to be done was left entirely up to Steele. While Phillips' evidence was that Wirth inspected the work and conversed briefly with Steele's employee Southworth, it can by no means be inferred that he reserved the right to direct and control the means or method of performing the work. Wirth's and the appellant's interest was in the result of the undertaking, that is, having the ditch cleaned of silt rather than in the particular method or means by which it was accomplished, and as previously indicated, no right of control was retained by Wirth on his behalf or the appellant's behalf.

The appellee suggests that since Steele was to be paid at an hourly rate for the work, this was strong evidence of an employer-employee relationship existing between Wirth, the appellant, and Steele. The point is not well taken. In *Smith v. Brown,* 152 Kan. 758, 107 P. 2d 718, evidence of payment at an hourly rate for services was introduced in support of an employer-employee relationship, but this court determined that the general law was applicable; that it was the question of the right of control which determined the relationship and affirmed the trial court's order sustaining a demurrer to the plaintiff's evidence. The Pottorff case was cited and reaffirmed, and it was held that since the plaintiff was an independent contractor the defendants were not liable for his or his employee's negligence.

Under the facts and circumstances disclosed by the evidence, we conclude that Steele, who performed the work with his own equipment according to his own methods and without being subject to the control of Wirth except as to the result of his work, stood as an independent contractor to Wirth and to his co-joint adventurer, the appellant. (*Shay v. Hill,* 133 Kan. 157, 299 Pac. 263; *Redfield v. Chelsea Coal Co.,* 136 Kan. 588, 16 P. 2d 475; *Brownrigg v. Allvine Dairy Co.,* 137 Kan. 209, 19 P. 2d 474; *Mendel v. Fort Scott Hydraulic Cement Co.,* 147 Kan. 719, 78 P. 2d 868; *Schroeder v. American Nat'l Bank,* 154 Kan. 721, 121 P. 2d 186.)

The decisions of this court are innumerable regarding the liability of an employer for the acts of his servant, and the nonliability of a contractee for the negligence of a contractor in performing work under a contract. The landmark case in this jurisdiction and the

rule regarding such nonliability is set forth in *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498, 45 L. R. A. (n. s.) 930, Ann. Cas. 1912A 590, and in the first four syllabi as follows:

"The general rule is that when a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant and the contractee is not liable for the negligence or improper execution of the work by the contractor.

"To the foregoing rule there are many exceptions and limitations, one of which is that an owner, or a contractee, is responsible for injuries to a third party, caused by work done by an independent contractor, where the contract directly requires the performance of work intrinsically dangerous, however skillfully done.

"The mere liability to injury from doing the work contracted for can not be the test, for injuries may happen in any undertaking, and many are attended with great danger if carelessly managed, although with proper care they are not specially hazardous.

"The intrinsic danger of the undertaking upon which the exception is based is a danger which inheres in the performance of the contract, resulting directly from the work to be done and not from the collateral negligence of the contractor."

It may be said as a general rule that a contractee is not liable for the torts or negligence of his contractor or of his contractor's servants. (*Nelson v. Cement Co.*, 84 Kan. 797, 115 Pac. 578; *Pottorff v. Mining Co.*, supra; *Laffery v. Gypsum Co.*, supra; *Brownrigg v. Allvine Dairy Co.*, supra; *Smith v. Brown*, supra; *Reilly v. Highman*, 185 Kan. 537, 345 P. 2d 652; 57 C. J. S., Master and Servant, § 584, p. 353; 27 Am. Jur., Independent Contractors, §§ 27, 39, pp. 504, 517; 57 C. J. S., Master and Servant, §590, p. 359.)

As indicated by the Laffery case, there are exceptions to the general rule, one of which is that the owner or contractee is responsible for injuries to a third party, caused by work done by an independent contractor, where the contract directly requires the perfomance of work inherently or intrinsically dangerous, however skillfully done.

In deciding this case we start with the general rule and the exception thereto that the relationship of contractee and contractor existed between Wirth and Steele and that the appellant through Wirth, the contractee, would not be liable to Phillips for the negligence of Steele, the contractor, unless the contract directly required the performance of work inherently or intrinsically dangerous.

In the recent case of *Reilly v. Highman*, supra, the landowner contracted with his co-defendant to remove trees from his property in the city of Lawrence. The plaintiff Reilly was driving down the

street and one of the servants of the co-defendant felled a tree on his passing car resulting in damage. The district court sustained a demurrer to the petition and this court affirmed. The Laffery case was quoted with approval and the rule was reaffirmed, that mere liability for injury from doing work contracted for cannot be the test of liability, as a great many undertakings are attended with danger if carelessly done, and that the landowner, the contractee, would not be liable to the plaintiff for the negligence of the contractor unless the employment related to work which was inherently and intrinsically dangerous. In the opinion it was said:

"On the question of what type of work is or is not considered to be inherently or intrinsically dangerous, courts have found no rule of universal application by which they may abstractly draw a line of classification in every case. Generally speaking, the proper test is whether danger 'inheres' in performance of the work, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it. It is not enough that it may possibly produce injury. Stated another way, *intrinsic danger in an undertaking is one which inheres in the performance of the contract* and results directly from the work to be done—*not from the collateral negligence of the contractor. . . .*" (Emphasis supplied.) (l. c. 541.)

Phillips argues that while it may not be inherently and intrinsically dangerous to remove silt from a drainage ditch, under the known circumstances here attending the work—the presence of two high pressure pipe lines crossing under the ditch carrying gasoline—the contract directly required the performance of work intrinsically dangerous, however skillfully done, and the court did not err in overruling the demurrer. We do not agree. In the first place, the appellant and Wirth did what reasonably prudent men would do. Wirth contracted with Steele who was familiar with the ditch having initially constructed it, to clean it out. Steele knew of the existence of the pipe line, knew that it was exposed in the south ditch and also knew that when he constructed the north ditch in 1950 it had not been contacted or disturbed, but was buried below the depth excavated for the ditch. Steele testified he remembered the ditch and even recalled its width. Phillips' evidence failed to disclose that either the appellant or Wirth had any superior or better knowledge than Steele of the existence of the pipe line or its location. There is nothing to indicate that Steele was not possessed of proper equipment to do the job or that Steele or his employee lacked the proper skill or knowledge, nor is there any evidence that the appellant or Wirth knew of any lack of equipment, skill or knowledge on the part of Steele or his servant.

In the Reilly case it was not contemplated by the contractee-landowner that the trees would be removed in a manner that would result in the dropping of one of them upon the plaintiff's passing automobile, and so here, it was unnecessary to remonstrate with Steele, the contractor, not to remove anything more than silt from the drainage ditch for the reason that he might strike the pipe line belonging to Phillips. Particularly this is true where the party to perform the contract was the same person who originally constructed the drainage ditch over the pipe line and did not contact it or strike it at that time. Applying the basic rule and the stated exception to Phillips' evidence, the simple fact of the case is that the contract to merely clean silt out of the then existing drainage ditch did not directly require the performance of work intrinsically dangerous, however skillfully done. The pipe line was buried below the bottom of the ditch and had Southworth followed Steele's directions "to clean out the ditch" it would not have been disturbed. The line was not struck when Southworth cleaned the ditch the evening before, but it was struck and ruptured when he attempted to rework that part of the ditch the next morning. It is clear that the damage susained by Phillips was caused by the collateral negligence of Steele and his servant Southworth, and the district court erred in overruling the appellant's demurrer to Phillips' evidence. (*Laffery v. Gypsum Co.,* supra; *Dohner v. Grocery Co.,* 116 Kan. 237, 226 Pac. 767; *Redfield v. Chelsea Coal Co.,* supra; *Redfield v. Chelsea Coal Co.,* 143 Kan. 480, 54 P. 2d 975.)

In view of the foregoing, the district court is directed to sustain the demurrer to Phillips' evidence and to enter judgment in favor of the appellant.

It is so ordered.

Fontron, J., not participating.