No. 55,222

FRANCES BALAGNA and JOSHUA BALAGNA, By and Through his Next Friend, FRANCES BALAGNA, *Plaintiffs-Appellants,* v. SHAWNEE COUNTY, KANSAS, *et al., Defendants-Appellees,* VAN DOREN-HAZARD-STALLINGS, *et al.,* and DALLAS W. FREEBORN, *Defendants-Appellees,* SHAWNEE COUNTY, KANSAS, *Third Party Plaintiff,* v. M. W. WATSON, INC., *Third Party Defendant-Appellee.*

(668 P.2d 157)

Opinion filed August 11, 1983.

*William H. Pickett,* of William H. Pickett, P.C., of Kansas City, Missouri, argued the cause, and *Robert J. Perkins,* of the same firm, and *Gene Schroer,* of Jones, Schroer, Rice, Bryan & Lykins, of Topeka, were with him on the brief for the appellants.

*Donna Voth,* Shawnee County Counselor, argued the cause and was on the brief for Shawnee County and Shawnee County Main and Lateral Sewer District No. 33, defendants-appellees.

*Herbert A. Marshall,* of Marshall, Hawks, Hendrix, Schenk and Nichols, of Topeka, argued the cause, and *Robert J. Perry,* of the same firm, was with him on the brief for Van Doren-Hazard-Stallings, *et al.,* and Dallas W. Freeborn, defendants-appellees.

*Ann L. Hoover,* of Fisher, Ochs and Heck, P.A., of Topeka, argued the cause, and *Robert D. Ochs,* and *Zackery E. Reynolds,* of the same firm, were on the brief for M. W. Watson, Inc., third party defendant-appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by the widow and child of Dennis Balagna to recover damages for wrongful death. The decedent, Dennis Balagna, was killed when the sides of a trench caved in on him while he was working at a construction site. The defendants are: (1) The architect-engineers, Van Doren-Hazard-Stallings and their agent, Dallas W. Freeborn, hereinafter referred to as Van Doren or the Engineers; (2) the landowners—Shawnee County and Shawnee County Main and Lateral Sewer District No. 33, hereinafter referred to as the County; and (3) the independent contractor and employer of Dennis Balagna, M. W. Watson, Inc. The district court granted the separate motion of each defendant for summary judgment, and plaintiff have appealed.

Most of the essential facts in the case are not in dispute and the trial court found them to be as follows:

1. Shawnee County entered into a written contract with M. W. Watson, Inc., for the construction of a sewage disposal facility known as Shawnee County Main and Lateral Sewer District No. 33, Waste Treatment Lagoons. The contract was executed April 18, 1978, and consists of pages C-1 and C-2 of the Project Manual. The Standard Technical Specifications and General

Clauses for streets, sidewalks, sewers and miscellaneous construction promulgated by the City of Topeka, Kansas, dated August 1977, were made a part of the specifications for Sewer District No. 33 along with the special conditions and specifications contained in the Project Manual.

2. Plaintiffs' decedent, Dennis Balagna, was an employee of the contractor working at the construction site on the sewer project in question. On June 28, 1978, Balagna was killed when the unshored and unbraced walls of a sewer trench collapsed. The trench where Balagna was standing was approximately five to ten feet deep. No employee of the County was present at the jobsite on the aforesaid date.

3. Specifications incorporated into the contract between the Contractor and County required the Contractor to follow certain safety precautions in the trenching as set forth in the Associated General Contractors of America (AGC) Manual of Accident Prevention and OSHA regulations. These regulations required that the trench in which Balagna was killed be shored.

4. The County did not actually direct or supervise the employees of the Contractor in the performance of their work.

5. Van Doren-Hazard-Stallings, the Engineers, contracted with defendant Shawnee County to prepare plans and specifications for the sewer project in question which it did. The County did not supervise or advise the Engineers in designing the plans and specifications for the project. During the construction phase of the project, no employee of the County undertook actual supervision of the Engineers. The contract between the Engineers and the County required that the Engineers review construction operations for compliance with the plans and specifications. It further provided that Engineers receive compensation for inspection services. The Engineers, as inspectors, in the course of the construction required the Contractor to replace certain reinforcing steel and to redo some compaction work.

6. Regarding the responsibilities of the Engineer, (defined by the Project Manual as the Shawnee County Engineer), the Standard Technical Specifications provided that the County Engineer should make corrections and interpretations as may be deemed necessary for the fulfillment of the intention of the contract documents. It further provided that the County Engineer should have the authority to regulate the amount of work

which may be open or under construction in advance of the completed portion of the work. The sequence of construction was to be approved by the County Engineer prior to construction if not covered by the plans and specifications. Any substantial deviation in the sequence was to be approved by the County Engineer. Such specifications also provided that the County Engineer could order suspension of the work or any part of it when due to prevailing inclement weather, temperature or any other condition whereby the quality or durability of the work could be adversely affected. They further stated that the County Engineer could inspect all materials and equipment used and all work done under the contract. In connection with such inspections, the County Engineer was to have access to all parts of the work, and the Contractor was to furnish information deemed pertinent by the County Engineer relating to the work and materials. No materials or equipment could be used in the work until they had been examined and approved by the County Engineer.

7. With respect to the right of the County to suspend or terminate the contract, the Standard Technical Specifications provided that should it be determined that the Contractor be intolerably negligent or slow in the prosecution of the work or should the Contractor consistently disregard laws, ordinances, regulations or instructions of the County Engineer, or otherwise be guilty of any substantial violation of the provisions of the contract documents, the County upon determination that sufficient cause existed, could terminate the contract without prejudice to any other right or remedy upon determination that the Contractor was not in compliance with provisions of the contract documents, written notice to be served upon the Contractor to the effect that the contract be terminated within ten (10) days unless the Contractor has complied. Such specifications also provided that the County should have the right to make alterations and modifications in the plans and specifications either before or after the beginning of the construction without affecting the validity of the contract and the performance bond.

8. The Standard Technical Specifications provide in Section 2, EXCAVATION, TRENCHING AND BACKFILLING, that "[t]he Contractor's proposed methods and procedures for performing these excavating and dewatering operations shall conform to the applicable

provisions of the AGC Manual of Accident Prevention and OSHA regulations. *The Contractor shall assume full responsibility for satisfactory performance of the work and the safety of the work and/or working personnel."* (Emphasis supplied.)

9. Paragraph 2 of the General Clauses of the Standard Technical Specifications provides under subparagraph (m) the following:

"The Contractor shall indemnify and save harmless the Owner and all its officers, agents and employees from all suits, actions or claims of any character, name and description brought for or on account of any injuries or damages received or sustained by any person, persons or property caused by the Contractor or his employees or by or in consequence of any neglect in safeguarding the work, or through the use of unacceptable materials in constructing the work or by or on account of any act or omission, neglect or misconduct of the Contractor or by or on account of any claims or amounts recovered by any infringement of patent, trademark or copyright, or from any claims or amounts arising or recovered under the 'Workman's Compensation Law', or any other law, ordinance, order or decree, and so much of the money due the Contractor under and by virtue of his contract, as shall be considered necessary by the owner, may be retained or, in case no money is due, his surety shall be held until such suit or suits, action or actions, claim or claims for injuries or damages as foresaid shall have been settled and satisfactory evidence to that effect furnished to the owner."

10. In Article IV of the contract with Shawnee County dated December 15, 1977, the Engineers agreed:

"1. To furnish personnel to provide construction stakes for the Project.

"2. *To provide an inspector or inspectors, whenever work is in progress, to review construction operations for compliance with the plans and specifications.*

"3. To accept compensation for services set forth in Article IV, Sections 1 and 2, in such amounts and at such periods of time as hereinafter provided and such compensation shall be complete and sufficient payment for all work, equipment and materials used, and services rendered in connection with the described work." (Emphasis supplied.)

Other evidentiary matters covering the specific details regarding the tragic accident were developed through discovery depositions of witnesses who were either present at the time the accident occurred or who were experts with knowledge of the responsibilities and procedures involved in construction work comparable to that involved in this case. Those evidentiary matters will be discussed, where relevant, in the course of the opinion.

Since this appeal arises from the trial court's granting of each

defendant's motion for summary judgment, the general rules pertaining to summary judgment should be reviewed. A party against whom the motion is sought is to receive the benefit of all reasonable inferences and doubt that may be drawn from the facts under consideration. *Pedi Bares, Inc. v. First National Bank,* 223 Kan. 477, 575 P.2d 507 (1978). The pleadings are to be liberally construed in favor of the party against whom the motion is sought. *Lorson v. Falcon Coach, Inc.,* 214 Kan. 670, 522 P.2d 449 (1974). Where genuine issues of material fact remain unresolved, the granting of summary judgment is improper. *Kern v. Miller,* 216 Kan. 724, 533 P.2d 1244 (1975). Summary judgment is proper only when the questions presented are questions of law based on undisputed facts. *Farmers State Bank & Trust Co. of Hays v. City of Yates Center,* 229 Kan. 330, 624 P.2d 971 (1981). If the facts are undisputed or only one reasonable conclusion can be reached from the facts as presented, then the court may apply principles of law to the facts and grant summary judgment. *Goff v. American Savings Association,* 1 Kan. App. 2d 75, 561 P.2d 897 (1977). With these principles of law in mind, we will consider the trial court's granting of summary judgment to each of the defendants having due regard to the role which each played in the performance of the construction contract.

## LIABILITY OF THE ARCHITECT-ENGINEERS

In regard to the Engineers, Van Doren and its employee, Dallas W. Freeborn, the basic issue presented is whether they can be held liable for the contractor's failure to carry out the required safety practices in trenching operations at the jobsite either because of a duty existing under their written contract or because of the failure of Freeborn to take some appropriate action after his discovery that the safety procedures required for trenching operations under the contract were being violated.

The duty and responsibilities of an architect-engineer are covered in a comprehensive opinion by Justice Holmes in our recent case of *Hanna v. Huer, Johns, Neel, Rivers & Webb,* 233 Kan. 206, 662 P.2d 243 (1983). The basic holdings in *Hanna* are contained in the syllabus of that case which states as follows:

"An architect, or other design professional, who contracts with an owner of property for the preparation of plans and specifications for the erection of a building and who agrees to be responsible for the general administration of the construction contract between the owner and the general contractor is not

contractually responsible for the safety of the workmen on the jobsite unless such duty is specifically assumed in the contract." Syl. ¶ 1.

"Generally the duty of an architect to supervise or administer the construction work merely entails a duty to see that the building when constructed meets the plans and specifications for which the owner agreed to pay." Syl. ¶ 2.

"An architect who has contracted to supervise the construction of a building project may affirmatively or by his actions expand his contractual duties to include responsibility for safety practices on the jobsite. Factors to be considered in determining whether an architect has assumed such responsibility include (1) actual supervision and control of the work; (2) retention of the right to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) assumption of responsibility for safety practices; (6) authority to issue change orders; and (7) the right to stop the work." Syl. ¶ 3.

"As a professional, an architect cannot stand idly by with actual knowledge of unsafe practices on the jobsite and take no steps to advise or warn the owner or contractor." Syl. ¶ 4.

"For negligence to exist there must be a duty and a breach thereof before the conduct becomes actionable. If no duty exists there can be no negligence. Following *Madison v. Key Work Clothes*, 182 Kan. 186, 318 P.2d 991 (1957)." Syl. ¶ 5.

"Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself. Following *Blackmore v. Auer*, 187 Kan. 434, 357 P.2d 765 (1960)." Syl. ¶ 6.

In *Hanna*, the opinion of the court reviews the applicable law from various jurisdictions and concludes that the great weight of authority supports the rule that an architect does not, by reason of his supervisory authority over construction, assume responsibility for the day-to-day methods utilized by the contractor to complete the construction. The architect's basic duty is to see that his employer gets a finished product which is structurally sound and which conforms to the specifications and standards. Any duty that the architect may have involving safety procedures of the contractor must have been specifically assumed by the contract or must have arisen by actions outside the contract. In determining whether the architect's contractual duty to supervise the construction includes the safety practices on the jobsite, the architect may intentionally, or impliedly by his actions, bring the responsibility for safety within his duty of supervision. The factors which would appear to be relevant in any case where an attempt is made to expand the architect's liability beyond the

specific provisions of the employment contract are set forth above in syllabus ¶ 3 of *Hanna*.

Cases which have found liability on the part of the architect-engineer have usually turned upon specific facts creating a duty to the jobsite workmen. One of the factors stressed is the fact that the architect-engineer has gained actual knowledge of the dangerous condition in carrying out his supervisory duties. See for example *Caldwell v. Bechtel, Inc.,* 631 F.2d 989 (D.C. Cir. 1980). Other cases and law review articles on the subject are set forth in the *Hanna* opinion, 233 Kan. at 220. In *Hanna,* Justice Holmes stated that, if the architect-engineers had actual knowledge of unsafe practices, they should have taken some action in that case. However, in *Hanna* all evidence disclosed that they had not been advised of any such practices. Under the circumstances the architects, Huer, Johns, were held not responsible for safety on the jobsite since that duty was placed upon the general contractor as specifically spelled out in the contract.

In this case, plaintiffs advance several theories under which they claim the right to recover from the Engineers. They first maintain that the contract between the Engineers and the County required the Engineers to provide an inspector to review construction operations *for compliance with the plans and specifications,* and that the specifications, by referring to OSHA standards, specifically required shoring to be used in the trench where Balagna was working. Plaintiffs' argument is that the failure of the engineer to see that shoring was used, as required by the specifications, created a cause of action in favor of the plaintiffs. The trial court held that the Engineers in this case did not generally assume control of the contractor's methods or procedures in completing the job and, therefore, they cannot be held legally responsible for the trenching accident. We agree with the trial court that the contract between the Engineers and the County did not specifically place upon the Engineers the responsibility for the safety of the workmen on the jobsite. Such a result is required by the decision in *Hanna.*

We must, however, consider the question whether the Engineers can be held liable on the theory that their inspector, Dallas W. Freeborn, having actual knowledge that the trenching operations were being carried out in violation of OSHA standards, had a duty to take some appropriate action to prevent injury to the

employees of the contractor. We have considered the record in this case and concluded that there is evidence to show that the Engineers, Van Doren, through their employee, Freeborn, had actual knowledge of the safety standards requiring shoring in trenching operations and, furthermore, had actual knowledge that the prescribed safety precautions were not being followed by the contractor at the time the tragic accident occurred. In our judgment, this created a duty in the Engineers to take some reasonable action to prevent injury to the contractor's employee, Dennis Balagna. Whether or not the Engineers acted reasonably under all the circumstances was a factual issue which should have been submitted to the jury in this case. Hence, the trial court erred in granting summary judgment in favor of the defendant, Engineers, and their agent, Freeborn.

In arriving at this conclusion we note the following factual statements which are contained in the depositions:

The contract documents and supplemental specifications for the construction of the sewer, including trenching operations, were prepared by the architect-engineers, Van Doren. The contract documents and specifications are contained in a project manual which was introduced into evidence in the case. Since defendant, Van Doren, actually prepared the project manual, which included the specifications covering safety precautions to be followed in trenching operations, it cannot be denied that they had knowledge of those safety specifications.

Dallas W. Freeborn, Van Doren's inspector at the construction site, was present on June 8, 1978, when the accident occurred in the course of the excavation of a trench. Freeborn testified in his deposition that the standard technical specifications which were included in the construction contract documents in this case are usually incorporated into most construction contracts to be performed in the Topeka city limits. He agreed that the AGC manual of accident prevention, which requires shoring in trenching operations, was made a part of the construction contract. He stated that he had previously read OSHA regulations regarding trenching. He was the project engineer for Van Doren on this sewer treatment lagoon. He and another employee, Schmitt, prepared the plans with attached specifications. He was the only engineer at the scene on June 28, 1978, when the accident occurred. He had previously had no specific discussion

about his inspection duties prior to his undertaking that job assignment, but he had been instructed orally that, if he found something was being done which was not in compliance with the plans and specifications, he was to tell the person in charge that the particular piece of construction was not in compliance and that they would not be paid for it.

Mr. Freeborn stated that, in a general way, he knew that the construction of a trench ten feet in length and five feet deep made of clay on both sides would probably require some shoring. On the morning of the accident, when he saw the trench in question, he knew that the trench should have shoring in it according to its dimensions. When he arrived at the site, a backhoe was in operation digging the trench. At the site he met Mr. Dinkel, an employee of the contractor, Watson, who was in charge of the work. He watched the excavation work for a few minutes and at one point saw two men in the trench. The two men had an engineer's level which was used to determine that the trench was on a specific horizontal plane. One man (Balagna) had the level rod and was holding it at various points checking the grade. He saw the man holding the rod walk into the excavation. It was not necessary that the man be in the trench to determine that it was level. That same determination could have been made by a person standing at the top of the trench and holding the rod down from the top.

At the time he saw the man in the trench, he noticed shoring or material for shoring lying on the top of the trench on the north side where he and Dinkel were standing. While he was there, a carpenter continued to bring more shoring material. Freeborn knew that the shoring materials were going to be used for excavation shoring in the trench. When questioned by counsel, he stated he knew that a man being in an unshored trench of that depth was in a dangerous situation, although, at the time, he did not give any particular thought as to whether it was dangerous or not. It is true that unshored trenches can be dangerous immediately after they are made.

Freeborn was asked by plaintiffs' counsel why he did not tell the man that was in the trench to get out of the trench until it could be shored. Freeborn's response was, "That man's boss was standing right there with me. It is not for me to tell him what to do." Thus, Freeborn stated that he chose not to enforce the

specifications regarding shoring in trenching operations, because that portion regarding safety involved methods the contractor chose to use to do a particular job and, "I don't tell him how to do his work." Freeborn admitted that, when he was there and reviewed the excavation work, he knew it was not in compliance with OSHA standards regarding shoring. He did not do anything because he felt it was the contractor's duty, not his. He did not consider telling the worker to leave the trench because he never tells any of the workers to do anything. He had been instructed by his employer, Van Doren, that, as an inspector, he was only to inspect the work as to the end product. Specifically in regard to the OSHA regulations regarding trenching he testified as follows:

"Q. And you observed the contractor not following them the day of Dennis Balagna's death, June 28, 1978, didn't you?

"A. Yes, sir.

"Q. And you took no steps to make sure he was told that they were not in compliance with that, did you, sir?

"A. Yes, sir.

"Q. You just stood there and let them be in a noncompliance state regarding safety regarding trenching compliance, is that correct?

"A. That's correct, sir.

"Q. Why?

"A. Because I am following the orders that I was given that we were not to be concerned with how the contractor did his work.

"Q. As an engineer since '54, would you consider trench excavation ultrahazardous or inherently dangerous activity for workmen involved?

. . . .

"A. Possibly it could be.

"Q. Why?

"A. There's always a chance it can cave in.

"Q. Unless adequate preventions to eliminate that are complied with, is that correct?

"A. Yes, sir."

The substance of Freeborn's deposition testimony was that, if he had told the employee to get out of the trench, he would have been overextending his power as the inspecting engineer at the jobsite.

There is also in the record the deposition of Earl Honigs, city engineer for the city of Topeka. Honigs manages the city engineering department and is responsible for site inspection regarding design and plans for city construction projects. He testified in his deposition that he was familiar with the dangers to

workmen in a trench if it is not properly shored. It was his opinion that, if shoring is called for in the specifications of the contract and shoring was not done, then the engineer may specifically address himself to the shoring because that is involved in work under the contract. It was his opinion that an inspecting engineer at the jobsite would have the power to suspend the work under a contract, if no shoring was in place in a trench being excavated where shoring was required by the contract. Honigs testified that, if he was at the scene and saw a man on more than one occasion walk into a trench where the shoring was lying at the top of the trench and where he knew there was a code violation, from his own personal experience he would have said something to the job supervisor. He would have asked the job supervisor what his intention was and whether he was aware of the conditions of the trench that then existed with a man in the trench.

We have concluded from the deposition testimony set forth above that a legitimate issue of fact was present in the case whether Freeborn, as the inspecting engineer, acted reasonably under the circumstances to prevent injury to Balagna as an employee of the contractor. We, therefore, hold under the principles of law stated above and the facts developed on discovery, that the district court was in error in sustaining the motion for summary judgment filed on behalf of Van Doren and its employee, Dallas W. Freeborn.

### LIABILITY OF THE LANDOWNER

The plaintiffs maintain that the trial court erred in entering summary judgment in favor of defendants, Shawnee County and Shawnee County Main and Lateral Sewer District No. 33. Shawnee County is the landowner which contracted with M. W. Watson, Inc., the contractor, to build the sewer project. The basic issue presented is whether Shawnee County, as owner, is liable for the negligence of M. W. Watson, Inc., the independent contractor. The well-established general rule in this state is that when a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the contractor. *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498 (1910); *Reilly v. Highman*, 185 Kan. 537, 345

P.2d 652 (1959); *Phillips Pipe Line Co. v. Kansas Cold Storage, Inc.,* 192 Kan. 480, 487, 389 P.2d 766 (1964). The Kansas cases recognize that there are many exceptions and limitations to the foregoing rule, one of which is that an owner or contractee is responsible for injuries to a third party caused by work done by an independent contractor, where the contract directly requires the performance of work intrinsically dangerous, however skillfully done.

The plaintiffs rely primarily on this exception which is known as the "inherently dangerous activity" doctrine. The doctrine is set forth in the Restatement (Second) of Torts § 427 (1965), in the following language:

"§ 427. Negligence as to Danger Inherent in the Work

"One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

The reporter's note under § 427 in the Appendix to the original volume lists a number of situations in which the doctrine has been held applicable. Among those listed are included the following: Crop dusting and spraying insecticides; work involving excavation in or near the highway, where the excavation was left unguarded; work done above the highway or sidewalk, where something fell; work contemplating obstruction of the highway; installing safety doors on an elevator while it is in use; installing defective joists on a steel building frame; turning gas into mains before they were cemented; use of an acetylene torch near inflammable materials in repairing a building; repairing a skylight, with no arrangement for removal of loose iron, which was blown off; red hot rivets dropped into work being done below. Many cases are cited involving work of this type, some of which hold that the work was inherently dangerous with resulting liability to the contractee and other cases holding that work was not inherently dangerous, and, hence, the contractee was not liable.

The basic issue which faces us is whether the trenching work in this case falls within the ambit of the inherently dangerous activity doctrine so as to create liability on the part of the landowner-contractee, Shawnee County, for the negligence of

the contractor, M. W. Watson, Inc., in performance of the contract. In *Reilly v. Highman,* 185 Kan. at 541, the court states that on the question of what type of work is or is not considered to be inherently or intrinsically dangerous, courts have found no rule of universal application by which they may abstractly draw a line of classification in every case. In this regard, the court stated:

"Generally speaking, the proper test is whether danger 'inheres' in performance of the work, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it. It is not enough that it may possibly produce injury. Stated another way, intrinsic danger in an undertaking is one which inheres in the performance of the contract and results directly from the work to be done— not from the collateral negligence of the contractor. (27 Am. Jur., Independent Contractors, § 39, p. 518; 57 C.J.S., Master and Servant, § 590, b. (1), p. 361, and the annotation at 23 A.L.R. 1084, 1095.)"

The same test is recognized in *Phillips Pipe Line Co. v. Kansas Cold Storage, Inc.,* 192 Kan. at 488.

The plaintiffs in this case argue that trenching operations are inherently dangerous or, at the very least, a jury question remains as to whether such operations are inherently dangerous. We have no cases in Kansas on this point involving excavation or trenching operations. The cases in other jurisdictions are in conflict. In *Cummings, Admx. v. Hoosier Marine et al.,* 173 Ind. App. 372, 363 N.E.2d 1266 (1977), the court held that trenching, when properly shored, is not inherently dangerous and that the failure to provide shoring was solely the responsibility of the subcontractor. In that case, the construction contract included specifications that shoring and bracing would be required for digging trenches. It was held that the developer, as property owner, was justified in presuming that such specifications would be followed and, there being no evidence that the owner had knowledge of the failure of the contractor to provide shoring, the landowner was not liable. In *Smith v. Inter-Cty. Telephone Co.,* 559 S.W.2d 518 (Mo. 1977), the Missouri Supreme Court in a similar case reached the opposite conclusion, holding that the issue of whether trenching was an inherently dangerous activity was a fact question to be presented to the jury and that the jury could properly find that the landowner should have ensured that the trenches were shored during excavation operations.

There also are a number of other jurisdictions which have ruled as a matter of law that trenching is not inherently danger-

ous. *Hare v. Federal Compress and Warehouse Company,* 359 F. Supp. 214 (N.D. Miss. 1973); *Kemp v. Knox County,* 556 S.W.2d 546 (Tenn. App. 1977); *Oklahoma City v. Caple,* 187 Okla. 600, 105 P.2d 209 (1940); *Horn v. C.L. Osborn Contracting Co.,* 591 F.2d 318 (5th Cir. 1979).

The distict court in this case found the authorities cited above to be both persuasive and determinative of the inherently dangerous activity issue. The trial court held as a matter of law, on the basis of the undisputed facts contained in the record, that the trenching operations involved in this case were not inherently or intrinsically dangerous, and that the exception to the general rule of nonliability set forth in Restatement (Second) of Torts § 427, and in the Kansas decisions discussed above does not apply. It thus held that Shawnee County and the Sewer District were not vicariously liable for failure of the independent contractor, M. W. Watson, Inc., to use shoring in the trenching operations in this case. We have concluded that the trial court reached the correct result on this issue. The digging of trenches is work performed every day under many types of construction contracts. Where proper precautions are taken, injuries should not result to workmen from the caving in of the sides of the trench. In our judgment, injuries from the caving in of ditches because of lack of shoring is the direct result of the negligence of the contractor in the performance of the excavation work.

As an alternative theory, the plaintiffs further contend that Shawnee County breached another nondelegable duty by failing to require shoring and bracing of trenches under the so-called peculiar risk doctrine as set forth in Restatement (Second) of Torts § 416 (1965) which provides:

"§ 416. Work Dangerous in Absence of Special Precautions

"One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

Comment *a.* to § 416 states that there is a close relation between § 416 and § 427 as to dangers inherent in or normal to the work. The rules stated in these two sections have been applied more or less interchangeably in the same type of cases. The cases where the rule of § 416 is applied usually involve factual circumstances

where the work is to be performed near public streets or high-ways. In considering the peculiar risk doctrine in this case, the trial court held that it was not applicable in view of the fact that there was no showing that any of the employees of Shawnee County had any intimate or detailed knowledge of the work being performed. The record clearly establishes that there was no employee of Shawnee County present during the trenching operations or any evidence to show that Shawnee County or its engineers had reason to anticipate that the independent con-tractor, M. W. Watson, Inc., did not intend to follow the safety requirements in performing the work. We agree with the trial court that the peculiar risk doctrine contained in § 416 of the Restatement should not be applied in this case.

The plaintiffs further maintain that Shawnee County should be held liable on the basis of liability imposed upon a possessor of land for injuries to an invitee resulting from hidden dangers on the premises. Plaintiffs cite the traditional common-law rule that an owner or possessor of land who invites a person to enter upon the land owes a duty to that person to have his premises in a reasonably safe condition for use in a manner consistent with the purpose of the invitation. Under the rule, a possessor of land may be held liable to such invitee for an unsafe condition of land if the condition is known to the possessor and not to the invitee. The duty to keep premises safe for invitees has generally been applied only to defects or conditions which are in the nature of hidden dangers which an invitee does not know or could not discover in the exercise of ordinary care. There is no liability for a danger which is as obvious and well known to the person injured as it is to the owner.

In the present case, the premises were in a reasonably safe condition at the time the contractor took possession, since no trenching existed at the time the premises were turned over to the contractor. The trenching without shoring or bracing was a condition created by the contractor. Under the circumstances, the trial court correctly rejected the contention of the plaintiffs that Shawnee County could be held liable on the theory that a possessor of land is liable to an invitee for a hidden danger.

Finally, the plaintiffs contend that the trial court erred in holding that Shawnee County could not be held liable for failure to carry out its supervisory duties over the project. We find no

error in this regard. It is clear from the record that Shawnee County did not direct or supervise the employees of M. W. Watson, Inc., in the performance of the construction work. Its employees were not personally involved in the actual construction of the project. Furthermore, there is no evidence to show that employees of Shawnee County exercised any supervisory duties over the consulting engineers. Shawnee County as landowner totally relied upon the architect-engineers to provide plans and specifications, and to protect its interests vis-a-vis the contractor. Under all the circumstances, it is clear from the record that Shawnee County did not control the manner in which the work was performed. There is nothing in the record to show any negligence on the part of Shawnee County or the Sewer District. On the basis of the rationale set forth above, we hold that the trial court did not err in granting summary judgment in favor of Shawnee County and Shawnee County Main and Lateral Sewer District No. 33 as a matter of law.

### LIABILITY OF THE CONTRACTOR

Finally, the plaintiffs contend that the trial court erred in dismissing the plaintiffs' action against the contractor, M. W. Watson, Inc. The trial court denied plaintiffs' claim against Watson on the ground that the Kansas Workmen's Compensation Act provides the exclusive remedy for plaintiffs' claims. The application of the workers' compensation act to the fatal injury of Dennis Balagna was not in dispute. He was on the job when the accident occurred on June 28, 1978. The injuries he suffered arose out of and in the course of his employment with M. W. Watson, Inc.

In their brief, the plaintiffs recognize the many Kansas cases which hold that no recovery can be had against an employer for injuries for which workers' compensation is recoverable. They contend, however, that compensation, within the meaning of the workers' compensation act does not include recovery of damages for such elements of damage as loss of companionship, society, and comfort from a husband and father. According to the plaintiffs, workers' compensation includes only medical and funeral expenses and wages at the rate paid at the time of injury. They urge us to hold that the plaintiffs should be allowed in this action to recover compensation by way of damages for nonpecuniary loss and also compensation for Balagna's lost earnings had he

worked during a normal life expectancy. We reject the contentions of plaintiffs and hold that the trial court properly dismissed plaintiffs' common-law action against M. W. Watson, Inc. Since the enactment of the workers' compensation act, it has been held to be the exclusive remedy against the employer provided to the injured employee or his dependents. The employee or his dependents recover benefits under the act regardless of proof of negligence on the part of the employer. An argument similar to that presented in this case was made and rejected in *Fritzson v. City of Manhattan*, 215 Kan. 810, 528 P.2d 1193 (1974). We hold that the trial court properly dismissed the plaintiffs' claim against M. W. Watson, Inc., and its judgment on that issue should be affirmed.

For the reasons set forth above, the case is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings involving plaintiffs and defendants, Van Doren-Hazard-Stallings and Dallas W. Freeborn.

SCHROEDER, C.J., dissenting: The substance of the court's decision is to circumvent the limited recovery permitted by the Workmen's Compensation Act and make new law. Here the contractor responsible for compliance with safety standards in fulfilling his contract owed a duty to his employees to shore trenches made on the job site. The resultant liability of the contractor who was covered by the Workmen's Compensation Act for the death of the contractor's workman is borne by the contractor's workmen's compensation insurance carrier.

To reverse in this case the court relies on Syllabus ¶ 4 in *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, 662 P.2d 243 (1983).

This is pure dictum in *Hanna* and is taken from the portion of the opinion which reads:

"The general rule as to an architect's responsibility for negligence has been stated as follows:

" 'An architect may be held liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby any one lawfully on the premises is injured. An architect's liability for negligence resulting in personal injury or death may be based upon his supervisory activities or upon defects in the plans. The liability of the architect, moreover, is not limited to the owner who employed him; the modern

view is that privity of contract is not a prerequisite to liability. As in other negligence cases, however, there can be no recovery against the architect unless it can be established that his negligence was the proximate case of the personal injury or wrongful death sued for.' 5 Am. Jur. 2d, Architects § 25, pp. 688-89.

"As a professional, an architect cannot stand idly by with actual knowledge of unsafe safety practices on the jobsite and take no steps to advise or warn the owner or contractor. Even in such a situation, however, the plaintiffs still bear the burden of showing the duty owed to them, a breach of that duty and that the breach was the proximate cause of the injuries suffered." 233 Kan. at 221-22.

The quote from American Jurisprudence relates to the erection of an unsafe structure whereby one lawfully on the premises is injured. It pertains to the architect's obligation in his supervisory capacity to assure structural integrity, not the manner in which the contractor supervises his day-to-day operations. No authority from Kansas or any jurisdiction is cited for the proposition stated which follows the quote.

By the court's opinion the architect is absolved of any contractual responsibility for safety on the jobsite, but under the court's negligence theory the architect's supervisory capacity to see that the plans and specifications are properly fulfilled is enlarged to include responsibility for the OSHA standards written into the contract with the contractor. With this position I cannot agree.

In my opinion the trial court was correct in making findings based upon the record and in its rulings.

In its Memorandum Decision dated September 20, 1982, on the engineers' motion for summary judgment, the trial court made the following finding of fact, which is not disputed by the parties:

"8. In the Standard Technical Specification in Section 2, Excavation, Trenching, & Backfilling, it was stated that 'The Contractor shall assume full responsibility for the satisfactory performance of the work and the safety of the work and/or working personnel.' . . . Said specifications further provided as follows:

"The Contractor shall assume all risk and liability for accidents and damages that may occur to persons or property during the prosecution of the work, by reason of negligence or carelessness by himself, his agents or employees, and shall assume also all direct or indirect damage that may be suffered or claimed on account of any such construction or improvement, during the time thereof and until the work is accepted."

The district court rejected the contention that "plans and specifications" included the duty to ensure proper OSHA safety procedures for trenching, holding:

"The contractual duty of the Engineers in the instant case was merely to provide inspectors when work was in progress to review construction operations for compliance with the plans and specifications. The Engineers had no authority to stop work. Furthermore, their only responsibility was to *inspect* and not to *supervise* the progress of the work. They had no contractual duty or authority to control the method and manner of the Contractor's work. The Engineer was authorized to review construction operations for design compliance and to report any deviations to Shawnee County. No other authority was given by the contract documents."

The contention that the architect *assumed expanded duty* for jobsite safety by assuming responsibility for day-to-day methods of doing the work is also premised upon the interpretation of "specifications" as including OSHA safety regulations for shoring trenches, and the fact that twice the architect required the contractor to do extra work to bring the project in compliance with the plans and specifications. In response to this argument the trial court properly held:

"Plaintiffs strenuously argue that because the Engineers required the Contractor to replace certain reinforcing steel and to redo some compaction work, the Engineers had control over the day-to-day manner and method of actually doing the work. *Since the Engineers' role at the construction site as defined by the contract documents was only to ensure design conformity and not to supervise the work, such conduct as requiring reinforcing steel to be replaced or redoing compaction work in order to comply with plans and specifications, is not the exercise of sufficient control to justify requiring Engineers to adhere to a higher standard of care than contracted for and holding such defendants liable for the accident involving plaintiffs' decedent.*" (Emphasis added.)

The court further stated:

"The fact that Engineers required the Contractor to replace certain reinforcing steel and to redo some compaction work does not constitute a voluntary assumption of a duty to plaintiffs' decedent and is not the exercise of sufficient control in view of the contract provisions in question as to impose liability."

Here the facts disclose that both the representative of the architect, Dallas Freeborn, and the superintendent of the contractor in charge of the work, Mr. Dinkel, were standing together on the side of the trench when the deceased workman was seen in the unshored trench. The superintendent had the same knowledge of the OSHA standards that were made a part of the contractor's obligation as the architect. In fact, the superintendent had materials for shoring on the side of the trench that was still under construction. The backhoe was in operation on the trench, and it was only five feet deep and ten feet in length at the time of the accident. Who was the architect to notify of the

contractor's failure to carry out the required safety practices in trenching operations on the jobsite? The contractor? The contractor's superintendent was present on the jobsite and already had such knowledge. The law does not require the doing of a futile act. To whom was the duty of the architect, if any, owed? The workman in the trench? The architect had no authority to give the workman orders. Only the contractor's superintendent on the jobsite had this authority. The court in its opinion is vague as to the duty of the architect to act, particularly what duty the architect owed to the workman in the trench.

The majority says:

"We have considered the record in this case and concluded that there is evidence to show that the Engineers, Van Doren, through their employee, Freeborn, had actual knowledge of the safety standards requiring shoring in trenching operations and, furthermore, had actual knowledge that the prescribed safety precautions were not being followed by the contractor at the time the tragic accident occurred. In our judgment, this created a duty in the Engineers to take *some reasonable action* to prevent injury to the contractor's employee, Dennis Balagna. Whether or not the Engineers acted reasonably under all the circumstances was a factual issue which should have been submitted to the jury in this case." (Emphasis added.)

The court says nothing about comparative negligence. This case tried to a jury on comparative negligence principles will be strange, indeed, because the trial court is given no guidance as to how the jury should be instructed, and the jury will be required to decide the comparative negligence of the parties where only one of the parties had the contractual obligation to comply with safety standards.

The architect's duty to see that plans and specifications were followed merely entailed a duty to see that the sewer project when constructed met the plans and specifications for which the owner agreed to pay. The intervention of the architect on the two occasions where changes were made by the contractor falls under the architect's duty to see that the integrity of the work meets the plans and specifications.

The decision in this case could conceivably add 10% to the cost of construction projects in Kansas where architects are employed. Our legislature has provided that damages resulting from industrial injury or death to workers should be borne by those industries included under the Workmen's Compensation Act. While the Act imposes an obligation on industry, it also imposes a lid on the amount that can be recovered to compensate

for those injuries or deaths. This case will clearly impose additional financial burdens on the construction industry.

It is respectfully submitted the judgment of the trial court should be affirmed.

McFARLAND, J., joins the foregoing dissenting opinion.