**Donald R. REED, Plaintiff–Appellant,**

v.

**Conrad OCELLO and Glyndene Ocello, Defendants–Respondents.**

No. 63509.

Missouri Court of Appeals, Eastern District, Division Seven.

Aug. 17, 1993.

Krupp Law Offices, James P. Krupp, St. Louis, for plaintiff-appellant.

Wuestling, James & DeVoto, Robert L. DeVoto, St. Louis, for defendants-respondents.

KAROHL, Chief Judge.

Plaintiff, an independent contractor, who had a contract to trim defendant-homeowners' tree, was injured when a tree limb that his employee had trimmed fell and struck him. He sued homeowners for injuries sustained. His initial petition alleged liability in two counts, which were based on "the inherently dangerous activity" and the "failure to provide a safe work place" doctrines, respectively. An amended petition added a third count under the doctrine of "retained possession of land-negligence." Homeowners answered and moved to dismiss all counts for failure to state a cause of action. They also filed a motion for summary judgment with supporting memorandum of law. The trial court granted homeowners' motion for summary judgment. Plaintiff appeals, after abandoning all counts except the claim of liability under the "inherently dangerous doctrine." We affirm.

The pertinent facts of this case are as follows. The Ocellos own a parcel of land with improvements comprising their home and two small unattached garages. Situated on the edge of the property near a neighbor's fence and one of the Ocellos' garages was a large, dying sycamore tree. The neighbor, Mr. O'Rourke, had complained to the city's Department of Forestry that the sycamore tree was dangerous in its present condition. On March 12, 1990, the city dispatched Eugene Pasetti, who evaluated the tree and determined that it was hazardous. The Ocellos, in accordance with department procedure, received a letter stating that they were required to trim the tree or cut it down. Approximately 30 days later, Pasetti went back out to the premises and found that some of the limbs were trimmed off. However, some of the dead limbs remained. In his opinion the tree was still hazardous, and he determined the sycamore tree to be dead. The City Building Division Department condemned the tree. The Ocellos then contacted Reed. He had advertised his tree-trimming services in a local community newspaper. Approximately one week before the accident occurred, Reed went to the Ocellos' property to inspect the tree. Mr. Ocello and Reed then orally agreed that Reed would trim the tree of its dead branches for $250.

On April 14, 1990, Reed appeared at the premises with his dump truck and his tools consisting of a chain saw, a pruner, and a rope. Reed's cousin, Leonard Hodges, and Hodges' son-in-law, Tony Coleman, arrived to help with the removal of the limbs. Reed then met briefly with Mr. Ocello, the latter of whom restated the work he expected to be done, emphasizing that care should be taken not to damage his garage or his neighbor's fence or bushes, which were located near the tree.

There were no conversations between the Ocellos and Reed about the method Reed would use to trim the tree. Hodges was designated as the person who would climb the tree. He would then place a rope around the dead branches that could be severed at the trunk of the tree and then maneuvered and lowered to the ground by Redden and Coleman, who were on the ground holding the other end of the rope. This procedure was used so as to not damage the surrounding property, including bushes, fences, garages, and houses.

The tree was approximately 90 feet high. Hodges cut the first limb of the day, which was approximately 70 feet in the air and 7–8 inches in diameter and 25–30 feet long. Hodges intended to suspend the limb in the air by the rope and maneuver it to the ground. However, it instead went straight down. Coleman panicked and let go of the rope, but Reed still hung onto the rope. The limb subsequently struck Reed in the head, causing head and brain injuries and a fractured ankle.

Reed's sole point on appeal is the trial court erred in granting summary judgment on Count I of his petition, premised on inherently dangerous activity/negligence. Reed argues there remain genuine issues of material fact and the Ocellos owe a legal duty to him under the inherently dangerous activity/negligence doctrine for his injuries.

■■■ When considering appeals from summary judgment, we review the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371 (Mo. banc 1993). Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* We accord the non-movant the benefit of all reasonable inferences from the record. *Id.*

■■■ Our review is essentially *de novo*. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* The propriety of summary judgment is purely an issue of law. Because the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment. *Id.*

The trial court based its order for summary judgment on the finding that Reed was not within the class of persons to be "protected" under the inherently dangerous doctrine, because he was not a "third party." The trial court found that, under the evidence adduced, Reed was in fact the contractor and the employer for whom the inherently dangerous doctrine does not apply.

■ The inherently dangerous doctrine arose as an exception to the general rule that one who contracts with an independent contractor is generally not liable for bodily harm for the torts of the contractor or the contractor's servants. *Zueck v. Oppenhiemer Gateway Properties, Inc.,* 809 S.W.2d 384 (Mo. banc 1991). However, if the activity undertaken by the independent contractor is inherently dangerous, the common law recognized an exception that a landowner is liable to *innocent third parties* for injuries resulting from failure of the independent contractor to take special or reasonable precautions against the inherent risks or dangers. (Emphasis added.) *Id.* at 384. The trial court based its order for summary judgment on the finding that Reed was not an innocent third party. We hold the service performed by Reed in this case was not inherently dangerous because on undisputed facts, there was a safe way to perform this work.

The test to determine whether an activity is "inherently dangerous" is as follows:

To be inherently dangerous, the work being done must, by its very nature, involve some "peculiar risk" of physical harm. A peculiar risk is differentiated from a "common risk" in that common risks are those to which persons in general are subjected by ordinary forms of negligence which are typical in the community. [Citation omitted.] The theory of liability for an inherently dangerous activity is not applicable where the negligence of the independent contractor creates a new risk, not intrinsic to the work itself, which could have been prevented by routine precautions of a kind which any careful contractor would be expected

to take. *Hofstetter v. Union Electric Co.,* 724 S.W.2d 527, 530 (Mo.App.1986).

■ Thus, if there is a safe way to perform the activity, it is not inherently dangerous, and the general rule of landowner non-liability applies. In *Hofstetter,* we rejected a claim that the independent contractor's employee could recover against the landowner for injuries sustained while on a crane. *Id.* at 531. We held that the injury resulted from the "common risk" of not providing steps from a five-foot high platform, rather from some special hazard intrinsic to the work itself. *Id.*

Similarly, in *Sullivan v. St. Louis Station Associates,* 770 S.W.2d 352 (Mo.App. 1989), we held that the inherently dangerous doctrine had no applicability to injuries sustained by a subcontractor's employee when a come-along chain that was being used to laterally steady an 11,500–pound boiler shattered and the chain struck him in the head, causing brain damage. At the time of the accident, the boiler was being lowered with forklifts into a sub-basement that the lessee of the property was constructing. In rejecting the employee's contention that he was within the ambit of the inherently dangerous exception, we stated the following:

The case at bar is similar to *Hofstetter....* [The employee's] evidence showed, at best, that the act of moving and lowering the boiler was an inherently dangerous activity because it involved the risk of a large object falling.... [The employee], however, was not injured by the falling boiler; the boiler did not fall. His injury resulted from the shattering chain. The expert testimony ... stated that use of a crane was the preferable, perhaps only proper, method of executing this lift. If a crane had been used, the come-along chain arrangement would not have been necessary. Thus it is clear that ... [the employee's] injury was in fact caused by the contractor's choice of method, not by the danger inherent in lowering the boiler. Under the reasoning of *Hofstetter,* the inherently dangerous activity exception does not apply. *Sullivan,* 770 S.W.2d at 355.

In this case, the only person with any significant experience in trimming or taking down trees was Reed's cousin, Leonard Hodges. In his deposition, he testified he was in the separate employ of Alpine Tree Service. He also indicated that had Reed, the supplier of tools for the job, supplied a lift bucket, it would not have been necessary to use the ropes to "rope off" the offending limb and use the tree as a fulcrum to maneuver the branch to the ground. The more prudent manner of removing the limbs of the sycamore tree, according to Hodges, would have been to use a lift bucket, especially considering the tree's location and close proximity to the neighbor's property and Reed's garage. As in *Hofstetter* and *Sullivan*, Reed's injury was caused by his choice of method—that is, roping off the branches and using the tree as a fulcrum. He was not injured by any danger that could be found to be inherent in trimming trees. Therefore, under the reasoning of both *Hofstetter* and *Sullivan*, the inherently dangerous activity exception does not apply.

The judgment of the trial court is affirmed.

PUDLOWSKI and CRANDALL, JJ., concur.