No. 68,858

PAUL McCUBBIN, by and through his guardian, SHEILA Mc-CUBBIN, *Appellant,* v. JERALD WALKER and CAROL A. WALKER, d/b/a Valley Market, *Appellees.*

(886 P.2d 790)

Review of the judgment of the Court of Appeals in an unpublished decision filed November 12, 1993.

Opinion filed December 9, 1994.

*Donald Arthur McKinney,* of Michaud, Hutton, Fisher & Andersen, of Wichita, argued the cause, and *Derek S. Casey,* of the same firm, and *Donald L. Hochanadel,* of Overland Park, were with him on the briefs for appellant.

*Jonathan L. Laurans,* of Niewald Waldeck & Brown, of Kansas City, Missouri, argued the cause, and *Brian G. Boos,* of the same firm, of Overland Park, was with him on the briefs for appellees.

The opinion of the court was delivered by

HOLMES, C.J.: Plaintiff, Paul McCubbin, by and through his guardian Sheila McCubbin, appealed a district court decision granting summary judgment in a personal injury action to the defendants, Jerald and Carol Walker. The Court of Appeals, in an unpublished opinion filed November 12, 1993, affirmed the district court decision in part, reversed it in part, and remanded the case for further proceedings. The defendants filed a petition for review, and the plaintiff filed a cross-petition for review. We

granted both petitions. We now affirm the summary judgment granted by the trial court.

The facts are outlined in the Court of Appeals opinion as follows:

"Jerald and Carol Walker own Valley Market, a small, neighborhood grocery store in Kansas City, Kansas. Jerald Walker (hereinafter Walker) often used temporary help to perform odd jobs, such as painting, light carpentry, and other general maintenance duties, at the market and his other various rental properties. Walker viewed these individuals as 'contract labor' rather than as traditional employees; Walker would decide on the job to be done and then negotiate with an individual about the cost of performance.

"Two such individuals who frequently performed odd jobs for Walker were Gene Moser and Paul McCubbin. In April of 1989, Walker contacted Moser about a job involving trimming dead tree branches from some trees in front of the market. Moser agreed to do the job for $30. Moser, in turn, contacted McCubbin to help him trim the trees, and the two agreed to split the $30.

"The two men showed up to perform the job on April 15, 1989. Moser provided all of the equipment. Moser and McCubbin trimmed two branches from one tree and moved onto a second tree. One of the trimmed branches from the second tree struck McCubbin as it fell, causing McCubbin severe and permanent injuries.

"McCubbin's guardian initially filed a workers compensation claim, arguing that McCubbin was an employee of Walker. The administrative law judge (ALJ) held that the parties did not fall within the purview of the Kansas Workers Compensation Act as Walker did not meet the statutory definition of an employer and McCubbin did not meet the statutory definition of an employee. See K.S.A. 44-503; K.S.A. 44-505. The ALJ found that both Moser and McCubbin were independent contractors.

"McCubbin's guardian next filed suit in district court, alleging that McCubbin's injuries were the direct and proximate result of Walker's and Moser's negligence. Walker moved for summary judgment, arguing that no material questions of fact remained to be resolved and that tree trimming was not an inherently dangerous activity which would give Walker a nondelegable duty to warn McCubbin of the dangers involved. Walker further argued that he was under no duty to equip, supervise, or warn McCubbin of the obvious dangers involved in the trimming of trees.

"McCubbin strenuously objected to Walker's motion for summary judgment on the grounds that many genuine issues of material fact were not yet resolved and were best left for a jury to decide. However, the trial court granted Walker's motion, finding that assuming the greatest possible duty that could be owed by Walker to McCubbin, there was no breach. The court found that McCubbin's injuries were caused by his and Moser's actions and not by a condition of the premises. The court also found that McCubbin was an independent contractor,

although McCubbin's status as an employee or independent contractor was immaterial, based on its ruling. Finally, the court held that whether the activity in question was inherently dangerous was a question of fact, but in light of the court's holding of no breach of duty, the issue was moot."

Following the trial court's entry of summary judgment in favor of the Walkers, plaintiff dismissed the action, without prejudice, as to the defendant Moser, thereby making the court's action a final appealable order.

The Court of Appeals reversed the summary judgment, holding that whether McCubbin was an employee of Walker or an independent contractor was a question of fact to be determined by a jury and that whether tree trimming was an inherently dangerous activity was also a disputed question of fact for the jury. Other issues raised on appeal by McCubbin were affirmed by the Court of Appeals.

Defendants in their petition seek review of two issues:

1. Whether the inherently dangerous exception to the general rule of nonliability of a landowner extends to employees of an independent contractor; or
2. whether, under the facts of this case, tree trimming is an inherently dangerous activity.

Plaintiffs in their cross-petition for review assert three issues:

3. Whether the Court of Appeals relied improperly upon the assumption of risk defense as a basis for nonliability of defendants as employers of McCubbin.
4. Whether the Court of Appeals erred in affirming summary judgment on plaintiff's claim of negligent hiring.
5. Whether the Court of Appeals erred in affirming summary judgment on plaintiff's claim of premises liability.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 1993 Supp. 60-256(c).

"An appellate court is required to read the record in the light most favorable to the party against whom summary judgment was entered. The appellate court takes the party's allegations as true, and it gives him the benefit of the doubt

when his assertions conflict with those of the movant. Factual inferences tending to show triable issues are to be considered in the light most favorable to the existence of those issues. If there is a reasonable doubt as to the existence of fact, a motion for summary judgment will be denied. Moreover, pleadings and documentary evidence must be given a liberal construction in favor of the party against whom the motion is directed. [Citation omitted.]

"Summary judgment may be granted when the evidence shows no liability as a matter of law and where the central facts are not in dispute. [Citation omitted.] When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citation omitted.] In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. *An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact could not affect the judgment, it does not present a genuine issue of material fact.*" *Knudsen v. Kansas Gas & Electric Co.*, 248 Kan. 469, 483, 807 P.2d 71 (1991). (Emphasis added.)

At the outset, the first issue that must be determined is the status of the plaintiff McCubbin in relation to the defendants Walker at the time of this unfortunate accident on April 15, 1989. Put in another way, was the Court of Appeals correct in holding, under the facts of this case, that whether plaintiff was an employee of the defendant Jerald Walker or an independent contractor was a disputed matter of material fact to be determined by the jury?

While there is no precise definition which can be applied uniformly to all situations in determining whether a person is an independent contractor or an employee, we recently reiterated a longstanding general definition in *Falls v. Scott*, 249 Kan. 54, 64, 815 P.2d 1104 (1991), wherein we stated: "An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work." Each case must turn upon the particular facts involved, taking into consideration broad legal principles. In considering those broad legal principles, it has been stated:

"Although it is apparent, from an examination of cases involving the independent contractor relationship, that there is no absolute rule for determining

whether one is an independent contractor or an employee, and that each case must be determined on its own facts, nevertheless there are many well-recognized and fairly typical indicia of the status of an independent contractor, even though the presence of one or more of such indicia in a case is not necessarily conclusive. Such indicia are important as guides to the broader and primary question of whether the worker is in fact independent, or subject to the control of the employer, in performing the work. While particular indicia or elements are discussed more fully in the ensuing sections, it has generally been held that the test of what constitutes independent service lies in the control exercised, the decisive question being who has the right to direct what shall be done, and when and how it shall be done. It has also been held that commonly recognized tests of the independent contractor relationship, although not necessarily concurrent or each in itself controlling, are the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer." 41 Am. Jur. 2d, Independent Contractors § 5.

We have generally applied the same or similar criteria in determining whether, in a given case, a person was acting as an independent contractor. In *Falls*, the court stated:

"The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor. [Citation omitted.]

"Where the facts are undisputed or the evidence is susceptible of only a single conclusion, it is a question of law for the court whether one is an employee or an independent contractor. However, generally speaking, the question of whether an individual is an employee or an independent contractor is considered a question of fact for the jury or trier of facts." 249 Kan. at 64.

The single most important factor in determining a worker's status as an employee or independent contractor is whether the employer controls, or has the right to control, the manner and methods of the worker in doing the particular task. In addition,

for a person to be an employee or an independent contractor there must be a contractual relationship between the person desiring to have the work done and the person doing the work.

In the instant case, McCubbin originally filed a workers compensation claim asserting he was an employee of Jerald Walker. After extensive discovery, including lengthy depositions of both Jerald Walker and Gene Moser, the administrative law judge (ALJ) denied McCubbin's claim, finding that he was not an employee of Walker. In doing so the ALJ found: "[I]t is apparent when applying the applicable law to the factual situation contained herein, complete control of the work which was enjoyed by the claimant and his coworker [Moser], the status being that of an independent contractor."

In granting summary judgment in this case, the trial judge, after finding that Walker had not breached any duty owed McCubbin under any of the theories asserted, felt compelled to address the issue of McCubbin's status. In doing so the court stated:

"Now, in light of the finding and decision, it is not essential, or I should say that that disposes of the case and that provides the basis for sustaining the Defendant's Motion for Summary Judgment. Even though that is the case, I feel compelled to also address the issues here about whether or not the Plaintiff, Mr. McCubbin is an independent contractor or not, and if so, whether or not this was ultra-hazardous activity so as to impose a nondelegable duty upon Mr. Walker.

"First off, as to whether or not he was an independent contractor, I think, that the Defendant Walker's position is well-taken that the adjudication, by the administrative [law] Judge, that this is an independent contractor situation is well-founded.

. . . .

"Second, even if a finding by Judge Howard is not res judicata to this Court, *I still find that under the facts presented, there is no dispute over the essential facts here upon the issue of control.*

"The mere fact that Mr. Walker may have indicated which branches he wanted cut, I don't think that's an indication of control.

"I believe that I can hire somebody to trim particular branches of my tree and not lose the independent contractor situation.

"Now, that doesn't mean that there is a right to control how the tree trimmer is going to do the work.

"*So, I find, as a matter of law, that there is no evidence that Mr. Walker controlled or had a right to control how this job was completed.*

"So that renders this an independent contractor situation." (Emphasis added.)

The Court of Appeals, in reversing the summary judgment, found that there were disputed material facts on the issue of whether the tree trimming in this case constituted an inherently dangerous activity which might impose liability on the defendants if plaintiff was an independent contractor. The court then stated:

"In resolving this issue, another factual question remains as to whether McCubbin was an employee or an independent contractor. This is a question that is usually left to the trier of facts and should be determined by the trier of facts in this case. See *Falls,* 249 Kan. at 64. If McCubbin is found to be an employee, there is no breach of duty as previously determined. If McCubbin is found to be an independent contractor, liability may attach if tree trimming is found to be inherently dangerous."

Our review of the entire record fails to disclose any evidence which would support a finding that McCubbin was an employee or independent contractor of Jerald Walker at the time of this unfortunate accident. Nor is there any evidence that McCubbin had any contractual relationship with Walker relating to the tree-trimming job. Both Moser and McCubbin had no steady employment, and both did odd jobs for numerous people. Both had done various jobs for the defendants but never had been their full-time employees. When Jerald Walker had a maintenance or clean-up job to be performed at his grocery store, or at other properties he owned in the area, he would contract with someone, frequently Moser, to do the job for a set price and then the completion of the job was left to that individual. When the work was completed, Walker would pay the agreed price. Tree trimming was one of the various odd jobs which Walker would have Moser perform.

In April 1989, Walker wanted some dead tree limbs removed from a tree in front of his grocery store. He discussed the matter with Moser and they agreed upon a price of $30. From then on it was up to Moser to do the job, and upon completion of the work he would be paid. Walker had no contact whatsoever with plaintiff about the tree trimming and had no knowledge that McCubbin would be working with Moser.

Moser, in his deposition in the workers compensation case, testified in part:

"Q. As I understand it, you agreed with Mr. Walker to trim a tree.

"A. Yes, sir.

"Q. It was close to the Valley Market at least.

"A. Yes, sir.

"Q. The only thing that you and Mr. Walker discussed was the fact that he wanted a specific tree trimmed and you were going to be paid $30 for that, is that correct?

"A. Yes.

"Q. Did Mr. Walker at any time tell you or attempt to tell you how to trim the tree?

"A. No, sir.

"Q. Did he at any time control or attempt to control how you trimmed that tree?

"A. No, sir.

"Q. Did he at any time try or attempt to control the method, manner or procedure in which you or Mr. McCubbin trimmed the tree?

"A. No, sir.

"Q. Did he give you any directions or instructions or did he give Mr. McCubbin any directions or instructions that you heard on how to trim the tree?

"A. No, sir . . . .

. . . .

"Q. This $30 payment was for the complete job to be done of trimming the tree?

"A. Yes, sir.

"Q. Was it up to you to decide what branches needed to be trimmed?

"A. Yes.

"Q. Was it for you to decide how many branches needed to be trimmed?

"A. Oh, yeah.

"Q. And the location of the trimming, whether you cut them off long or short, was that for you to decide?

"A. Yes.

"Q. Did Mr. Walker at any time direct you or attempt to direct you in the completion of trimming this tree?

"A. No, sir.

"Q. You talked about the equipment that was furnished. Did Mr. Walker ever even talk with you about what type of equipment you were going to use, where you were going to get it, what was it going to cost and how were you going to use it? Did he talk to you about any of those things?

"A. No.

"Q. During the time that you were working on this tree did you feel that Mr. Walker had any right to fire you from your work?

"A. To fire me?

"Q. Yes, sir. The record might show that you are looking at me in somewhat of amazement.

"A. No unless he don't give me my $30.

"Q. Have you ever had occasion where your other contracting parties—counsel used the phrase you did odd jobs for them. Did you have occasion where they fired you when you were doing that job?

"A. No, sir.

"Q. Is it your testimony then that you did not feel that Mr. Walker had any authority or right to attempt to fire you while you were attempting to do your contract?

"A. Not until the job was done.

"Q. Did you feel that the time that you were doing this work that Mr. Walker had any right to control the way you did the work?

"A. No, sir.

"Q. Who had the right to control your work?

"A. Me, I'm the one in the tree.

"Q. You were the one before you get up in the tree decides how to get up in the tree, what equipment to use and how to trim the tree?

"A. That's right.

"Q. You indicated you had agreed to this contract for $30 sometime before the accident happened to Mr. McCubbin.

"A. Yeah.

"Q. Do you know approximately or have an opinion how many days or weeks before the accident happened that you entered the contract?

"A. It might have been ten days, I don't know. I told him I would get to it as soon as I could.

"Q. Did you have the right to get to it or start whenever you wanted?

"A. Yes.

"Q. Did Mr. Walker have the right to tell you when to start?

"A. No, I don't think so.

"Q. Did he have the right to tell you when to stop?

"A. Not unless he wanted to pay me.

"Q. On the date when Mr. McCubbin was injured did you decide to do the work on that day?

"A. Yes, we decided to do it.

"Q. You and Mr. McCubbin?

"A. Yes.

"Q. Did Mr. Walker tell you to do it on that day?

"A. No.

"Q. Did he tell you what time of day to start?

"A. No.

"Q. Did Mr. Walker ever even discuss how long it might take you to do this work?

"A. No.

"Q. How many hours of work?

"A. No.

"Q. There was never any discussion about that at all?

"A. No.

"Q. Who set the price of $30 to be paid for the tree to be trimmed?

"A. I did."

Walker, in his deposition in the workers compensation case, testified in part:

"Q. All right. Getting back to our arranging for these parties to trim the tree, did you at all speak with Mr. McCubbin?

"A. No.

"Q. Your only conversation in relation to arranging for the trimming of the tree was solely with Mr. Moser?

"A. That's correct."

. . . .

"Q. Now was this the contract price that you and Mr. Moser agreed to, $30?

"A. Yes, sir.

"Q. Was it based on the totality of the job? In other words, after the job was done, the removal of the limbs, trimming of the tree, he was to be paid $30?

"A. Yes.

"Q. This was not based upon any hourly rate?

"A. No.

"Q. Was ever any hourly rate of pay ever discussed?

"A. No.

"Q. Was it ever discussed with Mr. Moser or Mr. McCubbin?

"A. I don't know about Mr. McCubbin. I gave the contract to Gene. It was his job.

"Q. Did you even know that Mr. [Moser] was going to subcontract or to contract with Mr. McCubbin to have the work done?

"A. No.

"Q. Did Mr. Moser ever attempt to ask you for authority to enter into a partnership with Mr. McCubbin or joint venture with him to do the work?

"A. Never discussed it.

"Q. Was there ever any discussion about how many hours that it might take Mr. McCubbin or Mr. McCubbin and Mr. Moser to do the work?

"A. No, it was just four branches.

"Q. So no discussion about how long it would take or an hourly rate for the work at all?

"A. He might have said something about it won't take a half hour to knock it out but, you know—

"Q. He might have said that. Do you recall him saying that?

"A. No.

"Q. I want just what you recall. So when you're making your contract with Mr. Moser, there is no discussion about how long it will take him or any variation on how much he will be paid if it takes him ten hours or three hours?

"A. Right.

"Q. Did you have any discussion with Mr. Moser about any exact time he would have to do this work?

"A. He said he would do it over the weekend sometime, that's all.

"Q. Was it then up to Mr. Moser to pick the time to do the work?

"A. Yes.

"Q. Did you control when he had to do the work?

"A. No.

"Q. Did you control how he would do the work?

"A. No.

"Q. Did you ever attempt to control how he would do the work?

"A. No.

. . . .

"Q. Did you have any right to attempt to control how Mr. Moser or Mr. McCubbin was doing this work?

"A. No."

. . . .

"Q. How about furnishing the equipment with regards to the tree trimming? Did you furnish any of the equipment?

"A. No.

"Q. Did you contract to furnish any of the equipment?

"A. No.

"Q. Were you ever asked to furnish any of the equipment?

"A. No.

"Q. Did you own any right, title or interest in any of the equipment that was used on the job?

"A. No.

"Q. Did the contract that you had with Mr. Moser require him to supply the equipment that was going to be used, whatever it might be, for the job?

"A. Yes.

"Q. Did you ever try to tell him what equipment to get or to use?

"A. No.

"Q. Ever try to tell him how to use that equipment?

"A. No."

The depositions of Walker and Moser, taken in this case over two years later, were essentially the same as those taken earlier.

Plaintiff attempts to create an issue that McCubbin's status as an employee of Walker is a disputed material question of fact by

dwelling upon his past history of having done various odd jobs for Walker. Even if those instances were relevant, nothing in the record supports a finding that there was ever an employer-employee or master-servant relationship between Walker and McCubbin for the tree-trimming work performed on April 15, 1989. Plaintiff asserts that Walker retained sufficient control to make his status a jury issue because Walker told Moser what limbs he wanted cut from the tree. Such direction, however, does not support the control necessary to establish an employer-employee relationship and in any event would not apply to McCubbin, who had no contractual relationship with Walker. It is inherent in any hiring or contracting for a specific job that the worker, whatever his or her status, must be told what job is to be accomplished and what work is to be done. That direction in and of itself does not constitute the control, or the right to control, necessary to support a legal finding of an employer-employee relationship or to create a factual question for the jury to decide.

Plaintiff also relies upon a statement by plaintiff's daughter, Sheila McCubbin, that plaintiff had told his daughter "he was working for Jerry Walker that owned a store." That isolated statement, without further explanation or clarification, is not sufficient to create a disputed question of material fact.

The defendant, Jerald Walker, contracted with Moser for the cutting of a few limbs off a tree in front of Walker's grocery. The agreed price was $30. Moser was in full control of the job, furnished his own equipment, set his own time schedule, and hired his own help. Moser's status with Walker was one of independent contractor. Moser contacted McCubbin to help him on this job. They agreed to split the $30. Walker had absolutely no contact with McCubbin over this job, did not pay him, and did not even know that Moser sought his assistance. McCubbin's only possible contractual arrangement was with Moser, not Walker. We find no disputed material facts which would support the Court of Appeals' finding on this issue. In concluding that McCubbin was not an employee or independent contractor of Walker, we make no determination of his employment relationship with Moser. All parties seem to agree that McCubbin's employment relationship

with Moser was either as an employee or as an independent contractor. Having found that McCubbin was not an employee or independent contractor of Walker, we will assume for purposes of this appeal that McCubbin's status was that of employee or independent contractor of Moser. We do not rule out the possibility that further proceedings may develop some different relationship between Moser and McCubbin.

The next issue which must be addressed to determine this appeal is whether tree trimming, under the facts of this case, is an inherently dangerous activity.

Both the trial court and the Court of Appeals were of the opinion that if summary judgment was improper, then the issue of whether tree trimming was an inherently dangerous activity was a question of fact for the jury. It is the contention of Walker that both lower courts erred in determining that a factual question existed as to whether tree trimming is an inherently dangerous activity. Walker maintains that the material facts regarding this issue are undisputed and the question of whether tree trimming is an inherently dangerous activity is a question of law to be decided by this court. McCubbin disputes this contention, however, arguing that material facts are in dispute and that the question is properly for the finder of fact.

The rules of law regarding the inherently dangerous activity doctrine are comprehensively discussed in *Falls v. Scott*, 249 Kan. 54, 59-62, 815 P.2d 1104 (1991), wherein the court stated:

"As a general rule, when a person (a contractee) lets out work to another and reserves no control over the work or workmen, the relation of contractee and independent contractor exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the independent contractor. *Balagna v. Shawnee County*, 233 Kan. 1068, Syl. ¶ 3, 668 P.2d 157 (1983). An exception to the general rule is the inherently dangerous activity doctrine, which provides that one who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such dangers. *Balagna*, 233 Kan. 1068, Syl. ¶ 4.

"Restatement (Second) of Torts § 427 defines the 'inherently dangerous activity' doctrine in the following language:
    'One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.'
. . . .

"As to the question of what type of work is or is not considered to be inherently or intrinsically dangerous, courts have found no rule of universal application by which they may abstractly draw a line of classification in every case. Generally speaking, the proper test to determine if an activity is inherently dangerous is whether danger inheres in the performance of the work, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it. It is not enough that it may possibly produce injury. Stated another way, intrinsic danger in an undertaking is one which inheres in the performance of the contract and results directly from the work to be done—not from the collateral negligence of the contractor. *Reilly v. Highman,* 185 Kan. 537, 541, 345 P.2d 652 (1959); 41 Am. Jur. 2d, Independent Contractors § 41, p. 807; 57 C.J.S., Master and Servant § 590, b.(1); Annot. 23 A.L.R. 1084, 1095. The same test is recognized in *Phillips Pipe Line Co. v. Kansas Cold Storage, Inc.,* 192 Kan. 480, 488, 389 P.2d 766 (1964).
. . . .

"When the facts are undisputed, whether an activity is inherently or intrinsically dangerous is a question of law to be decided by the court. When ruling on a motion for summary judgment involving this question, the trial court as a matter of law must determine from the undisputed facts contained in the record whether the activity under review is inherently dangerous. When the facts are disputed, the question is to be determined by the jury."

In determining whether an inherently dangerous activity exists, each case must rest upon its own facts. While some cases hold that the substance or subject matter of the activity is so volatile that the particular activity is presumed to fall within the inherently dangerous activity doctrine, the vast majority of cases recognize that most activities do not fall within the doctrine. If the doctrine is applicable, the alleged dangerous nature of the activity must be the cause of the injury suffered. Even though an activity may be inherently dangerous, if the danger is not the cause of the injury there is no liability on the employer-contractee. Our inquiry

is limited to whether tree trimming is an inherently dangerous activity under the facts of this case.

The trial court found that a factual question existed as to whether the tree-trimming activity in question was inherently dangerous. The trial court also determined that McCubbin was an independent contractor but concluded that this determination was irrelevant due to its additional conclusion that Walker "could not have breached any duty that he might have owed to the plaintiff." Apparently, the trial court found that, even if the activity was inherently dangerous, Walker did not breach his duty to "take reasonable precautions against such danger" inherent in tree trimming. However, the trial court did not state which disputed facts prevented it from determining, as a matter of law, whether tree trimming is an inherently dangerous activity.

The Court of Appeals examined those facts which it found material to the issue, stating:

"The record reflects that Walker viewed the job as 'simple' and as a 'piece of cake.' However, McCubbin's expert on tree service testified at his deposition that accidents can sometimes occur 'because of the inherent potential danger of the practice of trimming trees.' This expert further testified that '[e]ven using all of the safety practices in effect, things do go wrong,' and that '[y]ou can have an accident whether you're careful or not.' There is also a dispute in the record as to the size of the branches cut (from 2 inches to 10 inches in diameter) and to the height of the branches which were trimmed (from approximately 9 feet to 28 feet).

"Walker contends that the trial court erred in finding that the facts surrounding this issue remained in dispute and asks this court to determine as a matter of law that the activity was not inherently dangerous. Walker argues that the job merely involved climbing a ladder and using a chain saw to cut down a few dead branches from a tree. McCubbin does not dispute the nature of the job but objects to its characterization as a 'piece of cake.' *The record reflects that the facts surrounding the contemplated conditions under which the work was to be done and the known circumstances attending it are still in dispute.* See *Falls,* 249 Kan. at 61." (Emphasis added.)

The Court of Appeals determined that it was precluded from addressing the question of whether tree trimming was an inherently dangerous activity because of two disputed facts—the size of the branches (2" to 10" in diameter) and the height of the branches which were trimmed (9' to 28'). In doing so, the court

applied an overly strict application of the general rule that when facts are disputed, the question is to be determined by the jury. The real issue is whether the size and height of the tree limbs, when resolved favorably to plaintiff, were the cause of his unfortunate injuries and sufficient to make the activity inherently dangerous.

Numerous Kansas cases have considered the inherently dangerous activity doctrine under a variety of factual situations. In the early case of *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498 (1910), Laffery, a miner, was killed when a rock fell from the roof of the mine in which he was working. The court discussed at length the inherently dangerous activity exception to the general rule of nonliability of one contracting with an independent contractor. The court stated the general rule and the exception as follows:

"The general rule, variously stated, is that when a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of the contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor. [Citations omitted.] To this rule there are many exceptions and limitations. [Citation omitted.] One of these exceptions relates to work intrinsically dangerous, and the plaintiff contends that this exception, instead of the general rule, applies here.

"It has been held in many cases that an owner, or a contractee, is responsible for injuries to a third party caused by work done by an independent contractor where the contract directly requires the performance of work intrinsically dangerous, however skillfully done." 83 Kan. at 354.

In finding that mining was not an inherently dangerous activity, the court stated:

"It is clear from the cases cited, and many others in which the subject has been considered, that the intrinsic danger of the undertaking upon which the exception is based is a danger which inheres in the performance of the contract, resulting directly from the work to be done and not from the collateral negligence of the contractor. . . .

. . . .

"In the absence of legislation upon the subject, the courts have not hitherto held, as a matter of law, that mining generally is so intrinsically or inherently dangerous as to make the owner of a mine liable for the negligence of an independent contractor resulting in injuries to a servant of such contractor, where

it was not shown that the mine was unsafe when the contract was made or that the owner reserved some control of its operation. So to hold would go beyond the province of the judiciary." 83 Kan. at 357-62.

In *Nelson v. Cement Co.*, 84 Kan. 797, 115 Pac. 578 (1911), another mining case, the court recognized with approval the rule announced in *Laffery*. Other cases in which this court has both addressed and answered the question of whether a specific activity was inherently dangerous include: *Balagna v. Shawnee County*, 233 Kan. 1068, 1082, 668 P.2d 157 (1983) (the digging of trenches associated with a sewer project is not an inherently dangerous activity); *Griffin v. Rogers*, 232 Kan. 168, 177, 653 P.2d 463 (1982) (operation of an excursion boat is not an inherently dangerous activity); *Essmiller v. Southwestern Bell Tel. Co.*, 215 Kan. 74, 77, 524 P.2d 767 (1974) (digging a trench in a residential backyard, approximately 4½" wide and 12" to 18" in depth, to lay telephone cable is not an inherently dangerous activity); *Phillips Pipe Line Co. v. Kansas Cold Storage, Inc.*, 192 Kan. 480, 488, 389 P.2d 766 (1964) (performing grading and excavating work on land adjacent to and over two high pressure pipelines carrying gasoline is not an inherently dangerous activity).

While our research has located several cases addressing the question of whether logging or felling trees (tree removal) was an inherently dangerous activity, we found only one case addressing the precise question under review. *Reed v. Ocello*, 859 S.W.2d 242 (Mo. App. 1993), involved facts almost identical to those now before this court. The plaintiff, an independent contractor, sued the landowners for injuries suffered when a tree limb that his employee had trimmed fell and struck him. Reed had contracted with Ocello to trim dead branches from a tree on Ocello's property. The court stated the facts as follows:

"On April 14, 1990, Reed appeared at the premises with his dump truck and his tools consisting of a chain saw, a pruner, and a rope. Reed's cousin, Leonard Hodges, and Hodges' son-in-law, Tony Coleman, arrived to help with the removal of the limbs. Reed then met briefly with Mr. Ocello, the latter of whom restated the work he expected to be done, emphasizing that care should be taken not to damage his garage or his neighbor's fence or bushes, which were located near the tree.

"There were no conversations between the Ocellos and Reed about the method Reed would use to trim the tree. Hodges was designated as the person

who would climb the tree. He would then place a rope around the dead branches that could be severed at the trunk of the tree and then maneuvered and lowered to the ground by Redden *[sic]* and Coleman, who were on the ground holding the other end of the rope. This procedure was used so as to not damage the surrounding property, including bushes, fences, garages, and houses.

"The tree was approximately 90 feet high. Hodges cut the first limb of the day, which was approximately 70 feet in the air and 7-8 inches in diameter and 25-30 feet long. Hodges intended to suspend the limb in the air by the rope and maneuver it to the ground. However, it instead went straight down. Coleman panicked and let go of the rope, but Reed still hung onto the rope. The limb subsequently struck Reed in the head, causing head and brain injuries and a fractured ankle.

"Reed's sole point on appeal is the trial court erred in granting summary judgment on Count I of his petition, premised on inherently dangerous activity/ negligence. Reed argues there remain genuine issues of material fact and the Ocellos owe a legal duty to him under the inherently dangerous activity/negligence doctrine for his injuries." 829 S.W.2d at 244.

In determining whether the activity was inherently dangerous, the court set forth the following test:

"To be inherently dangerous, the work being done must, by its very nature, involve some 'peculiar risk' of physical harm. A peculiar risk is differentiated from a 'common risk' in that common risks are those to which persons in general are subjected by ordinary forms of negligence which are typical in the community. [Citation omitted.] The theory of liability for an inherently dangerous activity is not applicable where the negligence of the independent contractor creates a new risk, not intrinsic to the work itself, which could have been prevented by routine precautions of a kind which any careful contractor would be expected to take." 859 S.W.2d at 245.

The court went on to state that if the particular activity could be performed in a safe manner, then the activity was not inherently dangerous and the general rule of landowner nonliability applied. 859 S.W.2d at 245. In that instance, the Missouri court determined, based upon the undisputed facts of the case, that the manner in which the branches were trimmed and lowered was unsafe and that a more prudent manner of removing the limbs was available and should have been utilized. The court concluded that the contractor "was not injured by any danger that could be found to be inherent in trimming trees," 859 S.W.2d at 246, and that the inherently dangerous activity exception did not apply.

Considering the similarity of the issues and facts to our case, *Reed* is instructive and persuasive on the present issue.

Plaintiff in the present case retained as an expert witness Kim Barrett Rische, who apparently was a professional tree trimmer. His deposition was taken as part of the proceedings herein, but unfortunately plaintiff has failed to include it in the record. Instead, we have been furnished bits and pieces of the deposition in support of plaintiff's position. We have no way of ascertaining whether these selective portions of Rische's testimony are in context or not. "An appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, an appellant's claim of alleged error fails." *Smith v. Printup*, 254 Kan. 315, Syl. ¶ 14, 866 P.2d 985 (1993).

As near as we can determine, Rische first observed the trees in question some two or three years after the accident. He observed the trees from the ground. From this casual inspection, he apparently concluded which branches were the ones cut by Moser and McCubbin two and one-half years earlier. In his selective testimony, Rische makes several conclusory statements that working in the trees "can be a dangerous occupation" and that because of "the inherent potential danger of the practice of trimming trees, yes, things can happen." At one place Rische testified:

"Q. Okay, my question was, if someone is under the tree for any reason, and you are the tree trimmer in the tree with your chain saw operating, and you are trimming branches, do you have an expert opinion as to the risk involved to the parties beneath the tree?

"A. It's greatly increased. He has things falling out of the tree now that he didn't have before."

Assuming that Rische had been qualified as an expert and that a proper foundation was laid for his expert opinion, neither of which is supported by this record, we do not find his conclusory statements standing alone sufficient to create any material question of fact for the jury.

*Reilly v. Highman,* 185 Kan. 537, 345 P.2d 652 (1959), is highly persuasive, if not controlling, on this issue. In *Reilly,* a motorist's vehicle was severely damaged while proceeding down a residential street when it was struck by a falling tree. The landowner had engaged Highman, an independent contractor, to remove trees from his front yard. During the tree removal one of the trees fell

out into the street, striking the plaintiff's car. The plaintiff sued both the landowner, Lawrence, and the independent contractor engaged in the tree removal, alleging the inherently dangerous activity exception to the general rule of landowner nonliability applied. The trial court sustained a demurrer to the plaintiff's petition, holding that the plaintiff failed to plead sufficient facts to state a cause of action under the inherently dangerous activity doctrine. The petition alleged, in pertinent part:

"5. That because of the intrinsically dangerous work, to wit: removing and falling large trees right near the public streets the owner of the premises, the defendant Lawrence, was obligated to see that said work was carefully performed and because of the fact that said work was not carefully performed in a workmanlike manner, defendant Lawrence is also liable to this plaintiff for the negligence of the defendant Highman." 185 Kan. at 539.

In affirming the trial court, this court reasoned:

"Paragraph 5 of the petition merely refers to 'removing and falling large trees right near the public streets' as being 'intrinsically dangerous work,' which, standing alone, amounts to nothing more than a conclusion. The mere statement that doing a certain thing is 'intrinsically dangerous' does not constitute a factual statement which justifies the conclusion. As was said in the *Laffery* case and other authorities cited above, an undertaking cannot be termed inherently dangerous merely because it may *possibly* produce injury—rather, the intrinsic danger of the work upon which the exception is based is danger which *inheres* in its performance resulting directly from the work to be done, and not from the negligence of the contractor." 185 Kan. at 542.

In the present case we have nothing more than conclusory statements from an alleged expert which do not create a material disputed fact that McCubbin's injuries were the result of his participation in an inherently dangerous activity. It does not take an expert witness to determine that if branches are cut from a tree, they will fall to the ground and increase the risk to anyone standing below. We conclude that the controverted facts as to the size and height of the tree limbs being cut, and the conclusory statements of Rische, do not create any material controverted issues of fact which, when viewed in the light most favorable to plaintiff, would support a finding that tree trimming is an inherently dangerous activity.

Based upon the record before us, we hold that the trial court and the Court of Appeals erred in finding that the question of

whether tree trimming, under the facts of this case, was inherently dangerous was an issue for the jury to decide. As stated repeatedly in our cases, an undertaking cannot be termed inherently dangerous merely because it may *possibly* produce injury—rather, the intrinsic danger of the work upon which the exception is based is danger which *inheres* in its performance, resulting directly from the work to be done and not from the negligence of the contractor. Tree trimming is an everyday activity that can be accomplished safely and, when done so, is an activity in which danger is not inherent in the activity itself. While we do not rule out the remote possibility that there might be a highly unusual and aggravated set of facts that would support consideration of the inherently dangerous activity doctrine, we hold that, generally, tree trimming is not an inherently dangerous activity. The tree trimming in this case, as a matter of law, did not constitute an inherently dangerous activity.

In our recent case of *Dillard v. Strecker*, 255 Kan. 704, 877 P.2d 371 (1994), we held that the inherently dangerous activity exception to the nonliability of a landowner does not extend to employees of an independent contractor covered by workers compensation. Walker urges us to expand our holding in *Dillard* to exclude the exception in all instances involving independent contractors and their employees. While the arguments in favor of doing so may have considerable merit, we do not deem it necessary or appropriate to consider expanding the holding of *Dillard* in this case. That issue is better left for another day when it may be directly determinative of the case then before the court.

One final issue, asserted by the plaintiff in his cross-petition for review, needs to be addressed. Plaintiff asserts the Court of Appeals committed error in affirming the summary judgment of the trial court on plaintiff's claim of negligent hiring. The Court of Appeals adequately addressed this issue, stating:

"McCubbin argues that numerous issues of material fact precluded the court from granting Walker summary judgment on the issue of whether Walker negligently hired, retained, or supervised Moser.

" 'Kansas has long been associated with the majority of states recognizing an action for negligent hiring and/or retention of an unfit or incompetent employee.'

[Citation omitted.] An employer may·be liable for injuries to a third person which are the direct result of the incompetence or unfitness of his employee, either where he was negligent in employing him or retaining him when the employer knew or should have known of such incompetence or unfitness. [Citations omitted.]

"The Kansas Supreme Court has more recently addressed this issue in *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 819 P.2d 587 (1991).

When a third party asserts a negligent retention and supervision claim against an employer, liability results not because of the employer-employee relationship but because the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor. The employer is subject to liability only for such harm as is within that risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee that the employer had reason to believe would be likely to cause harm. However, it is not necessary that the precise nature of the injury alleged by the third-party plaintiff would have been foreseen by the employer.' 249 Kan. 348, Syl. ¶ 1.

"Similarly, an employer can be liable for the negligent hiring of an independent contractor if the employer knew, or in the exercise of reasonable care should have known, that the contractor was careless, reckless, or incompetent. See *Falls v. Scott,* 249 Kan. 54, 815 P.2d 1104 (1991) (employer not liable for negligently hiring individual where there was no evidence that employer was aware of individual's alcohol problem); Annot., 78 A.L.R.3d 910 (when employer is chargeable with negligence in hiring careless, reckless, or incompetent independent contractor).

"Thus, regardless of whether Moser was an employee or an independent contractor, Walker will be liable for Moser's actions only if McCubbin can establish that Walker knew or should have known that Moser was incompetent or unfit at the time he was hired, or if Walker retained Moser with actual or constructive knowledge that he was careless, reckless, or otherwise incompetent. There can be no question that falling branches were a natural, foreseeable consequence of hiring Moser, as either an employee or independent contractor, to trim dead branches off a tree. Moreover, the record is clear that the work was authorized by Walker, it was done to promote Walker's business at the market, and it was the sole reason Walker hired Moser in the first place.

"McCubbin repeatedly argues that Moser was unfit to perform the task of trimming tree branches because he used no safety equipment. However, evidence regarding Moser's incompetence is irrelevant unless McCubbin can show that Walker knew or, in the exercise of reasonable care, should have known Moser was unfit when he hired him to perform the task. Walker testified that he believed Moser to be a 'professional tree trimmer,' based upon Moser's 40 years of experience in cutting trees. Walker stated he viewed Moser as 'capable'

of safely trimming trees; he had personally watched Moser trim trees before. There is no evidence of Moser having been involved in any previous tree trimming accidents. McCubbin has failed to come forward with evidence to establish a dispute of material fact regarding this issue to preclude summary judgment."

We agree with the Court of Appeals' analysis of this issue.

In view of the conclusions reached herein, the remaining issues asserted are moot. We affirm the trial court's granting of summary judgment in favor of the defendants Walker. We affirm the Court of Appeals in part and reverse in part as set forth in this opinion.

Summary judgment for the defendants Jerald Walker and Carol A. Walker is affirmed on all issues.